UNITED STATES of America,
Appellee,

v.

Antonio CORALLO, Henry Fried, Daniel
J. Motto and S. T. Grand, Inc.,
Defendants-Appellants.

Nos. 331–334, Dockets 32686–32689.

United States Court of Appeals
Second Circuit.

Argued Jan. 17, 1969.

Decided July 8, 1969.

See also, D.C., 284 F.Supp. 240.

Douglas S. Liebhafsky, Asst. U. S. Atty., New York City (Michael S. Fawer, Arthur A. Munisteri, Charles P. Sifton, Asst. U. S. Attys., and Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, New York City, on the brief), for appellee.

Jacob Kossman, Philadelphia, Pa., for defendant-appellant Antonio Corallo.

Arthur Karger, New York City (Alfred Donati, Jr., and Zoloto, Karger & Zurkow, New York City, on the brief), for defendants-appellants Henry Fried and S. T. Grand, Inc.

James M. LaRossa, New York City, (Herald Price Fahringer, Buffalo, N. Y., on the brief), for defendant-appellant Daniel J. Motto.

Before MEDINA, WATERMAN and KAUFMAN, Circuit Judges.

MEDINA, Circuit Judge:

Antonio Corallo, Henry Fried, Daniel J. Motto and S. T. Grand, Inc. appeal from judgments convicting them of conspiracy to use the telephone as an interstate facility with intent to violate the New York State bribery laws. The federal statutes involved are the general conspiracy law, 18 U.S.C. Section 371, and 18 U.S.C. Section 1952, which makes it a crime against the United States to use an interstate facility with intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity," including bribery in violation of state law. The indictment, handed down December 18, 1967 charged appellants together with James Marcus, Herbert Itkin and Charles Rappaport. Carl D'Angelo, Jr., is named as a co-conspirator but not as a defendant. Before the trial Marcus pleaded guilty and the case against Itkin was severed. After a jury trial presided over by Judge Edward Weinfeld, Rappaport was found not guilty and appellants were convicted. The principal, but not the only witnesses for the prosecution were Marcus and Itkin.

While the meetings, conversations and acts of the conspirators, and the various maneuverings, developments, sub-plots and backings and fillings are complicated and cover an extended period of time, the charge itself is a simple one. It is that Marcus, as Water Commissioner of the City of New York, had the sole discretionary power to award, without public bidding, on a cost-plus basis, a contract involving an estimated cost of $500,000 to $1,000,000, for the cleaning of the Jerome Park Reservoir in the Bronx; that appellants conspired with Marcus to arrange a kickback from Fried and S. T. Grand, Inc., Fried's company, if Marcus awarded the contract to

Grand; and that the interstate use of the telephone was reasonably in the contemplation of the conspirators because of the nature of the negotiations and the necessity for caution and secrecy incident upon the collection of the kickback, as Motto, a principal negotiator, was a resident of Connecticut.

## SYNOPSIS OF OPINION

### PART I

THE CONSPIRACY AND APPELLANTS' PARTICIPATION IN IT.

### PART II

ALLEGED ERRORS IN THE INSTRUCTIONS TO THE JURY AND IN REFUSALS TO CHARGE AS REQUESTED.

#### A

Proof of Events After the Award of the Contract to Fried on November 23, 1966 Was Relevant to the Crime Charged in the Indictment.

#### B

Whatever May Have Been Itkin's Contact With the FBI Nothing in This Record Supports Appellants' Claim That He Participated in the Conspiracy as a Government Agent.

##### 1.

*Itkin's Participation in This Conspiracy Was Wholly on His Own. The Record Does Not Sustain Appellants' Claim That Itkin Participated as a Government Agent Pretending to Be a Conspirator.*

##### 2.

*The Request for Instructions on the Subject of Entrapment Was Properly Denied.*

##### 3.

*The Trial Judge Properly Charged That in Prosecutions in Federal Courts for the Commission of Federal Crimes the Testimony of an Accomplice Requires No Corroboration to Sustain a Conviction.*

#### C

The Requests to Charge on the Subject of Extortion Were Properly Denied.

### PART III

AFTER CONSIDERING "ALL THE EVIDENCE IN THE CASE" THE JURY WAS WARRANTED IN FINDING THAT FRIED AND GRAND PARTICIPATED IN THE CONSPIRACY WITH REASONABLE ANTICIPATION THAT THE INTERSTATE TELEPHONE WOULD BE USED BY THE CONSPIRATORS OR SOME OF THEM TO EFFECT THE PURPOSES OF THE CONSPIRACY.

### PART IV

THE CONDUCT OF THE TRIAL.

#### A

The Grand Jury Testimony of Fried and Motto Was Properly Received and It Was Not an Abuse of Discretion to Deny the Motions for a Severance.

#### B

We Find Nothing Improper or Prejudicial in Certain Comments by the Trial Judge.

#### C

In View of the Direct Examination of Fried and His Testimony on Cross-Examination by Counsel for Other Appellants to Which No Objection Was Raised on Fried's Behalf it Was Proper for the Trial Judge to Ask Fried Whether Prior to the Trial He Had Informed the Prosecutor that Part of His Testimony Before the Grand Jury Was False.

## PART I
### THE CONSPIRACY AND APPELLANTS' PARTICIPATION IN IT.

Even a superficial study of the record indicates a substantial basis for the findings of the jury that there was in fact such a conspiracy and that each of the appellants was a knowing participant in it. Fried testified and admitted that he told Itkin he had paid $40,000. There was proof of the extensive use of the telephone both to Motto and his Connecticut residence and from Motto in Greenwich, Connecticut, to various members of the conspiracy in New York City, corroborated in many instances by telephone toll slips produced by the Telephone Company. Moreover, the web of association between the appellants and Marcus and Itkin is clearly established. With this in mind, we turn to our chronological statement of the facts, based upon the view of the testimony and exhibits most favorable to the prosecution.

James Marcus began his career in city politics by serving as an assistant campaign manager to John Lindsay as Lindsay ran for election as Mayor of New York in the Summer and Fall of 1965. In June or early July, 1965, Marcus was introduced to Herbert Itkin, a lawyer with connections in labor circles. He came to see Itkin frequently, until, after the election, he saw him practically every day. Itkin, in turn, introduced Marcus, in July, to Daniel Motto who was President of Local #350 of the Bakery & Confectionery Workers Union in Long Island City, and head of the Labor Non-Partisan League. Marcus hoped to gain an endorsement of Lindsay by Motto and by Motto's union supporters. With this end in view Marcus saw Motto several times during the campaign. After Lindsay's election in November of 1965, Marcus continued to see Motto and at one such meeting, in December of that year, when they went to a diner next door to Motto's Long Island City office for a cup of coffee, Motto introduced Marcus to Antonio Corallo, describing him simply as "my cousin Tony." In that same month, Itkin and Marcus, with several others, formed Conestoga Investments, Ltd., to discover and promote the financing of investments in foreign countries.

In January of 1966, as the new administration took office, Marcus was given an office at the Municipal Building, in the Water Department. Marcus acted for a time as a liaison between the new administration and the Water Department, and, once he was sworn in as Assistant to the Mayor in March, 1966, he began to oversee the activities of the Department. In the course of this supervision, in March, he learned from Abraham Groopman, then Deputy Chief Engineer of the Department, that the Jerome Park Reservoir in the Northern Bronx was in bad shape. The previous fall, in November of 1965, heavy winds had roiled the reservoir and an accumulation of sludge that lay at the bottom of the basin had risen to the top and gone out into the water distribution system of the Bronx. There were many complaints of dirty water, odors and bad tastes. Temporary measures were taken but, as the problem recurred, more drastic measures became necessary. The reservoir had not been cleaned since its opening in 1905 and its huge size—97 acres in surface area and 750 million gallons of water in capacity—as well as the apparently huge amount of sludge presented difficulties beyond the resources of the Water Department to remedy.

An emergency contract was proposed by the engineers of the Department to Marcus. By this procedure a qualified contractor is selected by the Commissioner to perform the job. The contractor is paid his costs plus an allowance for overhead and a specified profit, subject, of course, to audit and revision by the Comptroller's office. The letting of the contract is within the sole discretion and is the sole decision of the Commissioner, but he normally takes into consideration the advice and recommendation of his engineers. Emergency contracts are used when, as in the Jerome Park situation, the job is too large for the Department, the scope and method of work are not

fully determinable, and the operation must be performed within a limited amount of time, that is to say, in the Winter of 1966–1967, so the reservoir could be back in service in the Spring of 1967. Accordingly, in the Spring and Summer of 1966, discussions and consultations occurred within the Department concerning the best method to be used and the best contractor to do the job.

Marcus, meanwhile, in April, 1966, purchased 2,000 shares of Xtra stock at an average cost of about one hundred dollars a share. He purchased the stock on margin, which meant that he had to put up only a small portion of the purchase price in cash and the balance would be financed by the brokerage house, in this case Koenig & Co.

Shortly after the purchases, the stock went down drastically, falling to the low eighties. Koenig & Co. called repeatedly for more money to cover the stock purchases. Itkin had invested $6,000 of his wife's money in the stock and Marcus turned to him for advice. Itkin suggested that he might be able to obtain some money from Motto. So Itkin visited Motto at his office in Long Island City, told him that Jim wanted help on stock he was buying, and asked for a $25,000 loan. Motto replied that he might make the loan but wanted to be sure that Marcus would "play ball" with him and also that he would retain Charles Imperial in his position in the Water Department. Itkin, later that day or the next, phoned Marcus and repeated the conversation, asking if Marcus would retain Imperial and "Do you want to play ball in the City?" Marcus agreed: "Okay, get the money from him."

When Itkin called Motto back, Motto said he could lend only $20,000, not 25, and wanted to see Marcus before he did so. They arranged a meeting in Motto's car on 46th Street, between Madison and Fifth, where Motto usually picked up his wife in the late afternoon after her work. At the meeting, which was in April, Marcus agreed to retain Imperial, assured Motto that the stock would go up, that the profits on it would be shared with him,

and that he would "play ball." The money was not passed at that meeting but Itkin later received $12,000 from Motto, which represented a payment of $12,500, with interest deducted in advance. Itkin passed it on to Marcus who deposited it in his Koenig account, in the third week in April, 1966. The $7,500 balance of the loan was received and deposited in May.

Motto had told Itkin about the Jerome Park Reservoir in April and Itkin, in mid-May, casually mentioned it to Marcus. Marcus was surprised: how did Itkin know about it? Itkin replied that it was all over the street and rumored to be a contract larger than a million dollars. They then discused it a bit in general terms. Motto, however, kept after Itkin, trying to arrange for the handling of the contract. When this was reported to Marcus he understood it to mean "that he (Motto) would find a contractor or negotiate with a contractor and there would be a kickback." Late in May Motto told Itkin:

Look, I did the job, I got you the 20,000. Now there is a big emergency contract in the City of New York and Carl D'Angelo, Jr. is pushing me to get it for him. I would like to make sure that Jim is going to do this for us because this is our first big one and it is the biggest that was ever given out.

And he said that if Marcus would go along, he would introduce Itkin "to someone higher up." Shortly thereafter, Itkin went back to Marcus. Marcus wanted to delay and hold up Motto since Motto had been slow in delivering the balance of the loan. When Itkin said they could not hesitate, Marcus gave his agreement. Itkin relayed this to Motto.

Very late in May, and late at night, Motto took Itkin to the Pancake House in Queens and there introduced him to Corallo. Corallo was with some other people so, as he got up to leave, only said "I am glad you are going to work on the contract with us, we will get together in a few days."

A few days later, but still in May, 1966, Itkin and Motto met with Corallo again

at a diner in Queens. Corallo announced they were going to use Joe Pizzo as the negotiator, "Pizzo is going to handle it with Fried." And, he explained, this was "Henry Fried of McKay Construction," that Pizzo was his labor relations consultant and "they have been in many deals together." Corallo asked how much Marcus and Itkin wanted and Itkin replied that he would have to talk to Marcus. Then Corallo left and Motto immediately complained to Itkin that he thought he could do better and would use D'Angelo instead of Pizzo.

Itkin related all this to Marcus and emphasized that they would have to pick a figure. About two weeks later, in mid-June, Itkin and Marcus met at Itkin's office, which was at 300 Madison Avenue. They calculated they needed about $75,000 to clear their stock debt. Since they thought the contract would run about one million dollars, they chose 7½ per cent as their figure which, if everything ran according to schedule, would give them the money they needed.

Itkin then met with Corallo and Pizzo at Gian Marino's Restaurant on 59th Street and Lexington Avenue. Itkin said that Marcus wanted 7½ per cent. Pizzo said it was too high. Corallo told Pizzo to get it. Pizzo said he would try. Soon after that and still in mid-June, Motto met with Marcus and Itkin on 46th Street and reported that negotiations were going terribly, they were asking too much money, and that he, Motto, could do better. Motto also asked Marcus to come to Atlantic City for his Union Convention.

Marcus did drop by the convention on June 18, 1966. Motto and Marcus and their wives chatted. Mrs. Motto mentioned what a difficult time she was having in getting her daughter into a good school in Greenwich, Connecticut, where they lived, and she asked Mrs. Marcus if she could help. Then, after some socializing with the various delegates, Motto and Marcus went off into a corner. Motto said that things looked bad with Fried and that he could do better than Pizzo. Marcus replied that he didn't know what to say.

For the rest of June and until mid-August matters lay dormant. Itkin went out of the country for July and Marcus was on vacation in Maine during early August. Once back in the City, Marcus and Itkin met with Motto, in the third week in August, at the Chambers Street Restaurant in Queens. Motto suggested that they were asking too much money and that they should consider coming down. Late in August, Marcus lunched again with Motto but without Itkin and Motto again said he could do better than Pizzo in handling the negotiations. Motto related how well and how long he had known Fried, how they both shared an interest in horses, and how Fried had been "doing contracts" for a long time.

In early September, Motto, Itkin and Corallo met at the Pancake House in Queens and at the Loren East Restaurant in Manhattan to discuss the progress of the negotiations. Itkin learned for the first time at these meetings that Corallo and Motto were seeking 7½ per cent for themselves in addition to the 7½ per cent for Marcus. This, Corallo and Motto said, was too much, the price had to be lowered. Itkin complained, "Tony, I didn't think you were going to ask for the same amount. It is the Commissioner who is doing it and we want them to work for us." Motto replied:

> Listen, the guy that picks up the green should get 15 per cent for himself, and that is Pizzo, so there is nothing too much that you are asking. You come down. Why don't you talk to the Commissioner and see whether he will reduce it.

Itkin agreed to talk to Marcus but predicted he would be unhappy with it. Itkin relayed back the message from Motto and Corallo that they settle upon a smaller amount. Marcus, however, was concerned with his financial position. The price of Xtra had dropped to the low 40's and Marcus was getting calls from Koenig seeking more money for the margin account. In addition, he was considering purchasing more Xtra to lower his average in the stock. Marcus suggested to Itkin that he ask if Corallo would

lend him ten thousand dollars and if so, he would consider coming down.

On the morning of September 27, 1966, Marcus was sworn in as Water Commissioner. That afternoon he went over to see Itkin and Itkin said he was going over to the Loren East to see Corallo. He suggested that Marcus call there in a few minutes to see if the coast was clear. When Itkin arrived, he found Corallo and Pizzo seated with Armand D'Angelo who had been Water Commissioner in the Wagner Administration. Armand is the father of the Carl D'Angelo, Jr., a lawyer, named in the indictment as a co-conspirator. When Marcus phoned, Itkin told him to come over. As he arrived, he was met by Itkin near the hatcheck room. Marcus hesitated about going in when he saw D'Angelo. To delay, he made a few phone calls and as he finished, he saw D'Angelo leaving. Marcus and D'Angelo exchanged greetings and D'Angelo wished Marcus well in his new job. Marcus then went in and joined Pizzo, Corallo, whom he recognized as the man he had met in December at the diner near Motto's office, and Itkin at a new table.

Corallo stated they were asking for too much money, the price had to come down. Marcus replied that he did not know they had been seeking 7½ per cent on top of his share. Then he inquired about the loan. Corallo said if they came down, he would make the loan and that he thought there was going to be a deal. Itkin then turned to Marcus and suggested 5 per cent, a figure they had previously discussed between themselves. Marcus agreed to the 5 per cent. This meant a total of 10 per cent, instead of 15 per cent.

On September 28th, the next day, Corallo and Itkin met at 300 Madison Avenue. Corallo said the deal was dead, Pizzo had met with Fried and his brother and they just would not pay that much. Itkin suggested they try Motto who had been seeking to handle the deal all along. Corallo said "fine." Later Itkin called Motto who agreed to handle it but said that a total of 10 per cent was too much

and he would handle it at maybe 5. Itkin asked why. Motto replied:

Because Carl told me Henry Fried won't pay a dime over five. He is used to paying five and that is all he is going to pay.

Itkin told Marcus that Motto was going to handle the negotiations. Itkin then called Corallo and related Motto's advice. Corallo suggested they get together with Motto and a meeting was arranged at a luncheonette on 46th Street. At the meeting which was around the end of the month, Motto stated:

Look, Tony, I know I can get it, and there is no doubt in my mind, but I can't get more than 5 per cent. Now, is this going to be satisfactory to the Commissioner and is it going to be satisfactory to you? What are we going to do?

Corallo replied:

If that's the best you can do, that's the best you can do, and the Commissioner will just have to go along with us.

Itkin then asked whether Marcus would get his loan if he went along at 5 per cent. Corallo said yes.

Early in October, Itkin told Marcus that he would have to come all the way down. Marcus inquired whether he would get his loan still and demanded that he get 3 per cent and the rest could share the remaining 2 per cent. When he got an affirmative answer, he agreed to the new and final total of 5 per cent. Itkin next went to the Loren East Restaurant to meet Corallo. Itkin said that the Commissioner was agreeable to the 5 per cent and asked if Corallo had the loan money with him. Corallo asked whether Itkin was sure the Commissioner would agree. When he said yes, Corallo handed the money to Itkin in an envelope. Itkin then called Rappaport at the 300 Madison Avenue office and told him to come over and pick up the money since Itkin was leaving on a trip and did not want to take the cash with him. Corallo was wary of this arrangement but acquiesced.

Meantime Marcus was experiencing pressure on behalf of Grand from anoth-

er source. Vincent Albano, Republican County Chairman for New York County, had been suggesting Grand and Fried since early in the fall. In response, Marcus had suggested to Albano that Fried send a letter to the Department listing Grand's qualifications and equipment. On September 7th Grand sent the letter. In mid-October, Albano called again and suggested that Marcus come to his suite at the Hilton Hotel to meet Fried and have a drink with him. Marcus did and was introduced to Fried with a comment by Albano that Fried had always been a heavy contributor to the Party and he, Albano, would appreciate any work that could be given to Fried. He repeated, he would be very appreciative.

Albano was not, however, the only Republican interested in the contract. Joseph Ruggiero, an official of the New York County Republican Party, had approached Marcus early in the fall and suggested that Oakhill Construction Company be considered for the job. Although it was not specifically mentioned at first, Marcus assumed that they also were offering a kickback. Ruggiero had followed up his suggestion with several phone calls. Although Marcus knew that some people from Grand had appeared at the Water Department on October 11th and that Groopman had suggested Grand was the best qualified contractor for the job, still, to keep the field open, Marcus told Groopman to interview some additional firms.

Towards the early middle of October, Itkin returned from his trip to find that Marcus neded more money to cover a purchase of another 2,000 shares of Xtra stock. In about the third week in October Marcus suggested that they bring in Corallo again, but this time as an investor for an additional $10,000. Itkin said he would talk to Corallo about it. When he called Corallo, Corallo wanted to know first whether they had a deal. To check, Itkin called Motto at his home in Connecticut. Motto replied he would meet them at 46th Street. A day or so later, Motto, Itkin, and Rappaport met at 46th Street. Motto said: "It's a deal, we got it for 5 per cent. Now, all we have to do is push this." He also said that the payoff would be made all at once. On the next day, Itkin contacted Corallo to tell him the good news, but Corallo already knew. Itkin asked about the investment. Corallo indicated he would invest but wanted a 4 for 1 margin at 40 and wanted to see Marcus before he agreed. Shortly thereafter, Marcus and Itkin drove over to the Tower East Restaurant at 72nd Street and 3rd Avenue to meet Corallo. Itkin went inside, found Corallo with some other people, and after a wait took him outside. While they were walking out, Corallo said that he wanted it understood that for his $10,000 he would get $40,000 worth of stock, the 4 for 1 deal, and that he would share in the profits, if any, when the stock went up. Itkin agreed and they walked outside to meet Marcus. Corallo asked Marcus: "Well, now that we have done Jerome Park can we do some other things?" Marcus agreed. Corallo then repeated his 4 for 1 proposal. Marcus again agreed and thanked him. Corallo later delivered the money to Itkin and Marcus used it to purchase the 2,000 additional shares of Xtra. Marcus and Itkin also borrowed another $5,000 from Motto.

Relative to the split-up of the 5 per cent, Itkin, Corallo, Motto and Marcus met at 300 Madison Avenue in late October. Corallo said to Marcus: "3 for you, 2 for us." Marcus understood that to mean that he would receive 3 per cent and that Corallo, Itkin and Motto would split the remaining 2 per cent.

Marcus, however, was still considering Oakhill. On November 2nd, Oakhill's representative had come to a meeting at the Water Department. Marcus sat in and was told, after the meeting, that Oakhill was qualified. That same day Ruggiero showed up at the Water Department and promised that if Oakhill received the award, Marcus would get 5 per cent of the price for himself. This apparently convinced Marcus, for around the 16th of November he told Groopman to prepare the letters notifying Oakhill

that they were to receive the contract. Groopman in turn told Becker, his assistant, to make up the letters. Becker also called Oakhill to alert them to the job. On November 18th, the letters were typed and presented to Marcus who put the letters away in his desk until he could talk to Itkin, who was out of town.

When Itkin returned, he was first contacted by Rappaport who said that all hell had broken loose, Marcus had double crossed them by awarding the contract to Oakhill, and that Corallo and Motto had been up at 300 Madison Avenue constantly and were "wild." Itkin reached Motto one evening at his home in Connecticut and asked what was the problem. Motto was not amused:

> It's no problem, it's a complete double cross. Henry Fried just called me and told me that he found out that Oakhill was getting the contract. Now, what kind of a game are you playing? * * You are playing with the wrong people if you're going to play this way.

Later in the week when Corallo reached Itkin, the refrain was the same. A day or two later, on November 21st or 22nd, Itkin went down to the Municipal Building to talk to Marcus. They went outside and walked around the Municipal Building. Marcus acknowledged that he was awarding the contract to Oakhill, saying he had been pressured into it. Itkin was frenzied and screaming:

> If you are talking about pressure, you're insane and you're crazy, they'll kill you before they let you get through this sort of thing, and what the heck did you take the money from both Tony and Danny if you are going to play this way.

Marcus kept walking, saying he didn't know what to do. Itkin warned him that he had better call Tony and Danny if he was going to persist in awarding it to Oakhill; if not, Itkin would call and say the contract is for Fried. Finally, Marcus gave in and said he would award the contract to Fried.

Marcus went back inside the Municipal Building. The next day he called Groop-

man into his office and told him to draw up the letters again, awarding the contract to Grand. He said he had to do it because of political pressure. Groopman directed his secretary to do so and called Grand to alert them. The letters were signed on that day, Wednesday the 23rd, and sent off to Grand who received them that Friday. The letters were dated the 18th because the secretary in her haste to rewrite the letters in the name of Grand rather than Oakhill had copied the date from the Oakhill letters. Itkin, meanwhile, had called Motto in Connecticut to notify him that Fried was getting the contract.

Now that the contract had been awarded, Marcus, Itkin and Corallo were eager to get the money. Marcus tried to reach Motto both at home and at his office but failed. Corallo kept pushing Itkin to contact Motto. Finally, in December, Itkin did reach Motto. Motto suggested they meet and a meeting was set for mid-December at 300 Madison Avenue. Motto, Corallo, Itkin, Rappaport and Marcus were at the meeting. Marcus arrived late and was met outside by Itkin, who said: "Tony wants you to raise the roof with Danny and see if we can get the money." Marcus went in and demanded:

> Danny, you screamed and you yelled and you wanted your thing. Now I've done it. I've completed the contract. Where is the money?

Motto answered that Fried was very experienced, that he was hard to contact, that he could not pay the whole amount because he did not know how much the contract would amount to but he would pay 25 per cent as soon as a rough estimate could be made of the price of the entire contract. And that estimate would be made when the sludge had been lifted off the bottom. He promised that if they would agree, "Henry has told me I can ask for it and I will have it in a minute's notice." They agreed.

Later in December Itkin again came down to the Water Department to visit Marcus. He told Marcus that he had

misunderstood the phrase "3 for you, 2 for us" at the October meeting. Itkin now said that the split was to be 2 per cent for Marcus, 1 per cent each for Itkin, Corallo and Motto; in other words the "you" referred to was Itkin and Marcus together. Marcus thought that this was a heck of a time to tell him but that nothing much could be done as the contract had been let. Itkin told him to relax for they had many other projects in the works.

Marcus and Itkin repeatedly tried to contact Motto in December and January as no money was produced. Marcus did reach him in Greenwich but always there was an excuse. Most often the excuse was that Fried was hard to reach. A little past mid-January, Marcus and Itkin each found out from Rappaport that the first installment had been paid but not in a fashion likely to please them. Motto had received a payment in excess of $10,-000. He had then taken something off the top and put it in his pocket, next he deducted $5,250 as repayment of his October loan with accumulated vigorish,[1] and then had deducted $4,000 as the share of himself and Corallo. This left a mere $750. When Rappaport complained, Motto gave him an additional $1,000. Thus, Rappaport received only $1,750 for Itkin and Marcus.

Soon after this initial payment, Corallo complained to Itkin that he had not received his share from Motto. Itkin kept calling and trying to push Motto but without success. Finally, in March, Corallo and Itkin received a call from Motto who told them to come over to 46th Street. They met Motto there and then he and Itkin walked over to the Hotel Roosevelt. There, in the men's room, out of a payment of $5,000, Motto handed over $3,000 for Marcus and Itkin and $1,000 for Corallo.

Towards the end of March, Corallo told Marcus and Itkin that he wanted to get out of the Xtra stock, which had gone up to somewhere in the 80s. Marcus and

Itkin met with Corallo at 300 Madison Avenue and calculated that Corallo was due $18,000 on his original investment of $10,000. They then withdrew the money from the margin account and paid him.

Itkin kept pursuing Motto by phone in hope of further payments. He reached Motto in early April in Connecticut and Motto promised that he had a definite appointment with Fried and would come by 300 Madison Avenue afterwards. He did come by but said Fried had been busy and couldn't see him. Corallo was angry:

Danny, do me a favor. Call him now, will you, and tell him you're coming over. Just do me a favor.

Motto replied he was just there. Corallo repeated:

I'm asking you to please do me a favor and call him.

Motto got on the phone, called "Carl," not Fried, and said: "I'm coming up for that thing, see that you get it." Motto hung up and said to Corallo that he would see them later. Corallo said no and ordered Itkin to go along with Motto. They went over to 50th Street and 6th Avenue where Motto made another call, asked for Carl, and said: "I'm coming up, I'm downstairs." He then went up, came down, and suggested they walk across to a coffee shop. They sat down and then Motto slipped Itkin $3,000 under the table. Itkin pointed out that Corallo was waiting for his money back at the office and so Motto slipped an additional $1,000 under the table. Then Itkin went back to the office, paid Corallo and distributed the rest.

Within a week, later in April, a fourth payment was made. Motto called up, said "we're lucky," for he had received another payment and suggested they meet at 50th Street. They met there, Motto went upstairs, came down and then started driving Itkin back to his office. In the car he passed another $3,000 but this time Itkin did not ask for Corallo's share since he was not going to see him. He went back to the office. Corallo had

---

1. "Vigorish" is the underworld term for usurious interest charged by loan sharks. Motto was charging Marcus 2% per week.

dropped in so Itkin told him that Motto would pay him. Itkin later notified Marcus of both payments. On April 24th, 1967, work on the reservoir was finished.

Corallo kept pushing for more money, so a meeting was set up at 300 Madison Avenue in mid-May. Corallo, Itkin, Rappaport and Marcus were there first. Corallo immediately complained that he was not receiving much money. Marcus joined the refrain by complaining of the "vigorish" that Motto had charged on the loans. This surprised Corallo who then told Rappaport to call and see if Motto was on his way. Rappaport reported back that Motto had left. When Motto walked in, he and Corallo and Itkin went into another room. Corallo ordered Motto:

> Put the money down on the table and let me explain something. I haven't been getting my share. I've laid out a lot of money in other things. I want it off the top now.

Corallo took off a sum of money and then bickering ensued about distribution of the rest. It finally came down that the share of Rappaport, Marcus, and Itkin of this $5,000 installment would be $500. Itkin commented that this was insane, that Marcus was walking around outside waiting for the money, and all he could show would be $500. Motto suggested that Itkin tell Marcus they had a lot of expenses. Itkin went outside, told Marcus of the small payment. Marcus replied angrily: "Well, this is a hell of a note. That's the last deal I'm going through with these fellows." Itkin returned to Corallo and Motto, relayed Marcus' message, and urged that they were silly not to take care of him now if they wanted to do future deals. Corallo said to Motto: "Danny, all right, you and I will each give him a hundred dollars more." Motto walked outside, found Marcus in the men's room, and said "Here, this is for you," gave him the $200 and walked out. About 10 minutes later, Itkin ran into Marcus who complained "Big deal, they gave me $200 more, I'm supposed to be thrilled." Itkin explained that Corallo had directed Motto

to give Marcus the $200 because of the vigorish payments. During the end of May, Itkin continued to push for further payment. Around the end of the month, Itkin reached Motto finally and Motto said that they had to meet and told him to be at Motto's office the next day. Motto took the initiative:

> You know, you're screaming for another payment, Henry Fried just showed me a little book which shows seven payoffs. Now, what are you talking about? There is very little money left for us.

Itkin replied: "Danny, that can't be. There was five payoffs. I picked it up four times, Charlie picked it up once." Motto replied:

> How would you know? You're running back and forth all over the world. Charlie probably picked up some extra payments.

Itkin replied that he was positive Rappaport had not picked up extra payments. Motto said to talk to him anyway but, regardless, there was only a few thousand dollars left.

Itkin then spoke individually to Rappaport, Corallo, and Marcus. Then the four met together at 300 Madison Avenue in mid-June. Itkin first accused Rappaport who swore that he hadn't taken anything extra. Corallo told him not to get excited but the only thing to do was to put it on Motto at a group meeting. A meeting was arranged at a luncheonette at 45th Street and 1st Avenue and Corallo, Itkin, Rappaport and Motto met. Motto insisted that they were confused, that Fried had it all down in a little book and asked whether either Itkin or Rappaport had any records. When they said no, he replied: "Well, all right, Henry Fried must be right, he has it down in a book." Corallo interrupted: "All right, I heard enough, I'm sick, I don't want to hear another word. How much more is left?" Motto said $2500. Corallo said that $1000 had to go to Pizzo for the work he did for which he had not yet received anything, and the rest would go to the Commissioner. Motto agreed and said he would get the money from

Fried. But shortly thereafter, Itkin heard from Motto that only $1600 not $2500 was due and owing. Corallo said all right but that still $1000 had to go to Pizzo and the Commissioner had to have the rest. And from then on throughout June and July and August, Itkin, Marcus and Corallo were to seek in vain for the remaining $1600.

In July, 1967, Fried phoned Marcus and invited him to have a drink. This was nothing new for throughout the Spring and Summer of 1967 Fried had called Marcus and invited him to have lunch or a drink with him. Marcus had consistently refused but this time he accepted. Fried suggested the Hotel Commodore later that afternoon. On the way there, Marcus picked up Itkin who suggested that after a few moments, Marcus should disappear and Itkin would see what Fried really wanted.

They walked in and found Fried already there. Marcus introduced Itkin to Fried as his friend and said that "anything you have to say you can say in front of him." They sat down and Fried discussed his horse farm and then invited them to visit the farm and also to use his boat at any time and with anybody. Itkin then started describing his Dominican Republic ventures, suggesting that Fried might do some work down there and Fried said that he thought it was a good idea and would like to hear more about it. Marcus excused himself to make a few phone calls but as he left said: "Anything you have to discuss you can discuss with Mr. Itkin." Once Marcus was gone, Fried said:

> I'm a lot older than you are and you are handling your deals with the City terribly, and if you will listen to me you won't get hurt, and you are handling it very badly. First of all, there is no reason to share with these other guys, what have you got to do with these type of people?

Itkin replied that he had worked with them on labor problems for a long time, but Fried continued:

> Well, do you know that I can handle the biggest payoffs in the City, there

is nobody that can handle it better than I, and I can handle a quarter of a million dollars in green at any one time if the deal is big enough.

Itkin interjected:

> Well, that's very good, Mr. Fried, but you only paid 30,000 of a $40,000 contract, and that doesn't sound very big, does it?

Fried replied that he had paid 40, not 30. Itkin allowed that the matter was confused but asked if he acknowledged that he owed $1600. Fried agreed that he did and said he would pay it when the Comptroller gave final approval on some items and only then. Itkin was annoyed: "One minute we're talking about a quarter of a million, the next minute you don't want to pay the 1600." And he insisted that Fried would have to finish up this deal before Itkin could deal with him independently on any others. Fried said he would pay Motto within the week. Fried also mentioned that Itkin was fumbling the Consolidated Edison contract and that he had the right way of getting into Consolidated Edison. Itkin insisted they finish Jerome Park up first. Marcus came back, they exchanged pleasantries and the meeting broke up.

In early August, Itkin met again with Fried at the Commodore. Edward Orlando, another construction contractor, called Itkin to say that Fried wanted to meet with the two of them. Fried had been pushing for a cleaning contract to go to Orlando. Fried had become Orlando's silent partner on this venture to avoid the fuss that would follow if it had been revealed that two such large contracts had gone to Fried. At the meeting, they discussed this, and then Fried gave Itkin $1500 for a contract previously awarded to Orlando. Fried again brought up the Consolidated Edison contracts but Itkin insisted that Fried pay up the balance of $1600 on Jerome Park before they settled on the new matter. Fried promised that he would pay off by the opening of his breeding farm on August 20th.

That August 20th, Itkin went up to the opening of the farm in upstate New York. He saw Fried who told him that he had paid the balance. Then Fried introduced him to Carmine De Sapio and suggested that they work together in the future. Marcus, who had been invited, did not go to the opening.

After the opening, Itkin contacted Motto. He mentioned that he had learned in a roundabout fashion that Fried had paid off. Motto wanted to know how Itkin knew, then denied receiving the money and said he would go up right away to get it. He left but the payment was not received. During the Summer and Fall of 1967, Marcus, Itkin and Corallo met several times at Itkin's apartment on East 15th Street to discuss the situation but their efforts were unavailing.

One of the investors in Conestoga had complained to the New York County District Attorney about Marcus. They had begun to investigate and had questioned him about certain large deposits in October, 1966, in his Koenig account. Marcus appeared before a state Grand Jury on December 8th and perjured himself by denying that he knew Corallo. Rappaport also was being investigated and apparently had turned over to the authorities the joint checkbook he kept for Itkin. One day when Rappaport came back from a visit to the authorities, he noticed Corallo and an associate sitting in a car in front of his office. He then went to Itkin who warned him that Corallo was mad and that he should leave town and call Itkin later in the week. Meanwhile, on December 12, Marcus resigned as Commissioner and went, with Itkin, to the FBI to give his version of the Jerome Park controversy.

Motto too found he was under investigation. In mid-November, he was served with a subpoena for the state Grand Jury. On the return date he was questioned about a purchase of stock by Itkin. The questioning was by an Assistant District Attorney and not before the Grand Jury, but Motto was told that at a subsequent date he would be required to appear and testify before the Grand Jury. On December 15th, he was served with a second state subpoena and on December 17th he was served with the federal subpoena. The other defendants were also served with the federal subpoenas on the 17th and told to be present on the 18th of December.

At the federal courthouse the morning of the 18th, in answer to subpoenas, were Fried, Marcus, Motto, Corallo, Pizzo, Rappaport, Itkin and D'Angelo.

■ This detailed chronological recital of the meetings, conversations, and acts of the various appellants, as the jury might fairly have concluded from the evidence in the case, renders it unnecessary, we think, to discuss the sufficiency of the evidence to sustain the charge made in the indictment. It is clear beyond any doubt that the jury could have found the existence of a conspiracy to negotiate a deal with Fried and S. T. Grand, Inc., to the effect that, upon the award of this large contract, Fried would pay Marcus and his associates a kickback of 5 per cent of the amount paid by the City; that the conspirators reasonably anticipated the use of interstate telephone communications between the various conspirators and Motto, who lived in Greenwich, Connecticut, and in fact on numerous occasions telephone communications were effected both to and from Greenwich, Connecticut, by one or another of the participants in the conspiracy; and that the joint venture continued during the ensuing several months while the bribe money was being collected and distributed. Indeed, we do not see how the jury could find otherwise without repudiating the testimony of Marcus and Itkin as unworthy of belief. Obviously, the jury did not do this, as Judge Weinfeld instructed the jury to acquit the appellants "if you do not believe Marcus and Itkin, * * * since the structure of the government's case in large measure rests upon their testimony." The active participation of each of the appellants in the scheme is also

established by an abundance of proof of his own words and deeds.

Other parts of the record will be discussed later in this opinion in connection with claims by appellants, or some one or more of them, that we must dismiss the indictment or order a new trial because of certain allegedly erroneous and prejudicial rulings by the trial judge.

## PART II

### ALLEGED ERRORS IN THE INSTRUCTIONS TO THE JURY AND IN REFUSALS TO CHARGE AS REQUESTED.

### A

Proof of Events After the Award of the Contract to Fried on November 23, 1966 Was Relevant to the Crime Charged in the Indictment.

■ Paragraph 2 of the indictment charged the defendants with using an interstate facility, the telephone, between Greenwich, Connecticut and New York with intent to:

promote, establish, carry on and facilitate the promotion, establishment, and carrying on of an unlawful activity, said unlawful activity being bribery in violation of Articles 34 and 170, Sections 372, 378 and 1826 of the Penal Law of the State of New York, [McKinney's Consol.Laws, c. 40], and thereafter said defendants would perform and attempt to perform acts to promote, establish, carry on and facilitate the promotion, establishment and carrying on of said unlawful activity.

And as one of "the means" by the conspirators to "carry out" the scheme, Paragraph 3(j) of the indictment alleges:

j. Defendants James L. Marcus, Herbert Itkin, Antonio Corallo, Daniel J. Motto and Charles J. Rappaport did make and receive and cause to be made and received telephone calls between New York, New York, and Greenwich, Connecticut, concerning the payments of money from defendants Henry

Fried and S. T. Grand, Inc. and distribution of the same by defendant Daniel J. Motto.

As the events subsequent to November 23, 1966 were plainly the "carrying out" of the conspiracy and as the allegation of interstate telephone calls between New York and Greenwich during the period of the collection and distribution of the bribe money is unambiguous and specific, we must conclude that appellants were adequately informed that the proofs would include events subsequent to November 23, 1966.

The very cases cited by Corallo in support of his argument that all evidence of events subsequent to November 23, 1966 should have been excluded, are to the contrary. In United States v. Kubacki, 237 F.Supp. 638 (E.D.Pa.1965), the defendants were charged with conspiring to obtain kickbacks for municipal officials in return for orders of parking meters. The award of the contracts was made before the effective date of Section 1952, but the payments were made afterwards. Defendants argued that the state offense of bribery was completed before the effective date of the statute and hence there was no indictable offense. The District Court rejected the argument, the interstate travel

was undertaken for the purpose of making the payoff contemplated as the *quid pro quo* for the award of the contract * * *. That conspiracy continued until the accomplishment of the last of its objects, delivery of the money and the clock. 237 F.Supp. at page 643.

Here also the payments and the use of the interstate phone to obtain them from Motto were part of the original agreement and certainly facilitated and helped to carry on the offense of bribery. And the same result, involving the effective date of the statute, was reached in United States v. Wechsler, 392 F.2d 344 (4th Cir. 1968), cert. denied, 392 U.S. 932, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968), where it was pointed out that while an indictable offense may have

been committed at an early stage in the conspiracy, the conspiracy itself continues until its objects are attained, that being the completion or consummation of the crime.

Corallo argues that New York law demands that we find the offense of bribery ends with the award of the contract because that is when the "wrong done to the people is complete by the corruption of the public servant." None of the cases interpreting Section 1952 support this statement, as "Reference to the state law is necessary only to identify the type of unlawful activity in which the accused was engaged." McIntosh v. United States, 385 F.2d 274, 276 (8th Cir. 1967). See also United States v. Nardello, 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969); United States v. Wechsler, supra, 392 F.2d 344 (4th Cir. 1968), cert denied, 392 U.S. 932, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968); and United States v. Kubacki, supra, 237 F. Supp. 638 (E.D.Pa.1965).

Moreover, even if the New York substantive law of bribery were applicable and controlling, it is interesting to note that the New York cases give no support to Corallo's argument. Thus, in People v. Gibson, 191 N.Y. 227, 231, 83 N.E. 976, 977 (1908), it was said:

> The bribe by which this influence is to be exerted may be paid in the present or in the future and after the influence has been exerted. The agreement and the receipt together constitute a single crime; and, if the briber deems it safer for his purposes to postpone payment till he has secured his consideration, the consummation of the offense and the running of the statute will be delayed till that event has occurred.

### B

*Whatever May Have Been Itkin's Contact With the FBI Nothing in This Record Supports Appellants' Claim That He Participated in the Conspiracy as a Government Agent.*

The path of the prosecutor in a conspiracy case is full of snares and pitfalls.

As the conspirators run for cover a favorite diversionary tactic is to spread confusion by pursuing digressions suggested by proof having only a tangential bearing on the case. Just such an opportunity presented itself when a reference was made to the fact that Itkin claimed to have had some contact with the FBI since as early as 1962.

### 1.

*Itkin's Participation in This Conspiracy Was Wholly on His Own. The Record Does Not Sustain Appellants' Claim that Itkin Participated as a Government Agent Pretending to Be a Conspirator.*

Whatever Itkin's contact with the FBI may have been, William Veriker, the FBI agent referred to by Itkin as his contact with the FBI, was available and counsel for Corallo said "We will call the agent." But neither he nor any of the other counsel for appellants did call Veriker or any other witness on the subject. So far as the subject has any relevance to the case, the only pertinent question is whether there was any evidentiary basis for appellants' contention that Itkin's participation in the conspiracy charged in this case was as a Government Agent, in cooperation with the FBI, to help appellants to provide proof of their guilt. On this subject Itkin's testimony is explicit and clear:

> The Court: Were you engaged in this on your own, the Jerome Park Reservoir? That was your own activity, was it not?
>
> The Witness: Yes, sir.
>
> The Court: You were acting on your own there as a participant?
>
> The Witness: Yes, I was.
>
> Q. You were doing this in order to turn the information over to the Government, is that correct? A. No.

Itkin never deviated from this position.

It is interesting to observe how the individual participants in the conspiracy endeavored, each in his own particular fashion, to gain some advantage from

Itkin's contact with the FBI, whatever it may have been. Itkin used it as a sort of anchor to windward throughout. Doubtless it helped him persuade the prosecutor to consent to a severance as to him. He claims he revealed all to the FBI in July, 1967, after the last payment had been received from Fried and the conspiracy was in effect over. In any event he pocketed the money, and it is something of a coincidence, as pointed out in summation by counsel for Rappaport, that Itkin should have waited until the state Grand Jury had begun its investigation, and the District Attorney of New York County was hot on his heels, to decide to tell all to the FBI.

If Rappaport had been working in an indirect sort of way with Itkin for the purpose of ultimately revealing the Marcus bribery conspiracy to the FBI, he could have taken the witness stand in his own defense and told his story. But he did not. Instead, Rappaport's counsel conducted a prolonged cross-examination of Itkin, called the witness Reiburn, who testified about the attempted purchase by Rappaport in May and July of 1967 of a tape-recorder, and finally called as a witness a former office associate who gave some vague testimony to the effect that Rappaport explained his neglect of some negligence cases by saying he was working on "something connected with the public interest and we are doing the right thing." This same lawyer also testified that Itkin came into the office in December, 1967 and said, with reference to Rappaport, "I don't know where he is. He must be talking to the District Attorney." Perhaps this indirect approach on the bias helped to convince the jury that Rappaport was not guilty. It is just as likely that the verdict exonerating Rappaport was based on his youth, on the fact that the indictment did not charge him with receiving any part of the bribe money, and on the claim of his counsel that he had been the innocent dupe of Itkin. We cannot see, as appellants argue, how any of this testimony substantiates the claim that Itkin was only a pretended and not a real co-conspirator.

Corallo and the other appellants use Itkin's reference to the FBI in a variety of ways. Their principal contention is that Itkin was not a conspirator at all but only a Government Agent pretending to be a conspirator. From this premise, apparently urged as matter of law, it is argued that it was error to describe Itkin as an accomplice and that it was error not to strike from the record Itkin's testimony of the hearsay declarations of Marcus and appellants as co-conspirators. As appellants did not choose to call anyone from the FBI as a witness, there is no testimony to support appellants' assertion that from first to last Itkin was working with the FBI and under the directions of the FBI in order to help appellants to commit the crime charged in the indictment. The testimony of Itkin on the point, as quoted above, is that whatever else he might have been doing with the FBI to uncover the machinations of the underworld, he was in this venture entirely on his own and acting wholly without the knowledge of the FBI until he found it to his interest to tell the FBI, after the last installment of the bribe had been paid.

It will serve no useful purpose to discuss the various arguments in detail. We find no concessions by the prosecutor that support the basic contention that Itkin functioned not as a conspirator but as a Government *Agent Provocateur*. Typical of the remaining bits and scraps is a quotation from a statement by Itkin when he was engaged in vilifying the FBI for not furnishing protection for the children of his first wife. In his statement, as written down by the FBI, Itkin said he "was pulling out" and was "going to make a real stink about this whole FBI deal" and "How I enticed and entrapped not only Marcus and Rappaport but how I enticed several of the others." Itkin said he lied about Rappaport and as he denied any activity as a Government Agent in the formation of and carrying out of the conspiracy, it is plain the statement has no probative force with

respect to any of the issues in the case except that of Itkin's credibility.

Thus we conclude it was not error for the trial judge to refuse to exclude or strike out Itkin's testimony on the ground that he was in fact a Government Agent and only a pretended participant in the commission of the crime.

### 2.

### The Request for Instructions on the Subject of Entrapment Was Properly Denied.

■ It is assigned as error by Fried that the trial judge refused to instruct the jury on the subject of entrapment. As the record is replete with proof of other kickbacks participated in by Fried and of a number of other new contracts he had in contemplation, it is difficult to picture Fried in the role of an innocent lamb, without any propensity to wrongdoing. And any theory of entrapment flies in the face of Fried's testimony of how he lay awake frightened by Pizzo's threats of what might happen to Fried if he did not pay the "finder's fee" demanded by Carl D'Angelo and how, at a time when Corallo, Motto and Itkin were engaged in a dispute as to whether Fried had made pay-offs aggregating $30,000 or $40,000, Fried answered Itkin's question "What did you pay on that Jerome Reservoir" by saying "$40,000." Despite Itkin's statement about how he "enticed Marcus and Rappaport and several of the others," the idea of intrapment in the context of the evidence in this case is absurd.[2]

### 3.

### The Trial Judge Properly Charged That in Prosecutions in Federal Courts

for the Commission of Federal Crimes the Testimony of an Accomplice Requires No Corroboration to Sustain a Conviction.

■ As part of his instructions on the subject of the credibility of the witnesses, Judge Weinfeld said:

The law does not prohibit the use of informers, but whether you approve of their use is not to enter into your consideration of this case. In certain types of crime the government, of necessity, is frequently compelled to rely upon the testimony of accomplices, persons with criminal records, or informers. Otherwise it would be difficult to detect or prosecute some wrongdoers, and this is particularly true in conspiracy cases. Often it has no choice in the matter. It must take the witnesses to the transactions as they are.

There is no requirement in the Federal Court that the testimony of an accomplice, an informer, or one with a criminal record be corroborated. A conviction may rest upon the uncorroborated testimony of such a witness if it is found credible and reliable. However, the testimony of such a witness should be viewed with great caution and scrutinized carefully.

The fact that Itkin is an informer, as well as the fact that he and Marcus are accomplices, that Marcus has a criminal record and has admitted perjury and other state crimes, the fact that Itkin has admitted acts of criminal conduct and other moral derelictions, should be considered carefully by you as bearing upon the credibility of each.

2. On the subject of entrapment Judge Weinfeld ruled:
The Court: That was a statement which he (Itkin) explained at the time. The fact of the matter is that the evidence is clear beyond any question in the Court's view that this was an independent venture of his own, that he participated on his own, it was not initiated by the government in any respect, and that it was after

the entire transaction was over that he informed the government as to the nature of the transaction.
I find no basis of any kind to the claim of entrapment. The evidence is clear on it. The fact he informed with respect to other transactions during this particular transaction does not lead to entrapment of anybody here.

These instructions are claimed to be erroneous in two respects.[3] First, it is said that Itkin was not an accomplice but a Government Agent only pretending to be an accomplice. We reject this claim for the reasons we have already discussed. Second, it is the contention of appellants that the New York State rule requiring corroboration of an accomplice should have been applied, because the conspiracy was alleged to be one to use an interstate facility to carry on bribery under New York State law. Judge Weinfeld applied the federal rule and we agree with him.

The broad purposes of this statute are clearly stated in United States v. Nardello, *supra*, 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969). The reference to "bribery * * * in violation of the laws of the State in which [it is] committed" is to the substantive offense. To hold that the federal court in which a defendant is tried on a criminal charge of violating Section 1952 must apply the rules of evidence and procedure that are in force in the State where the crime was committed would clearly be giving the statute "an unnaturally narrow reading." The conduct of criminal trials in the Courts of the United States is governed by the Federal Rules of Criminal Procedure and by rulings of the federal courts in matters of procedure and practice not explicitly or by clear implication covered by these Rules. Federal law does not require corroboration of accomplice testimony to sustain a conviction. Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442 (1917); McCullough v. United States, 403 F.2d 1013, 1015 (9th Cir. 1968); United States v. Carrique, 316 F.2d 186, 187 (2d Cir. 1963); United States v. Agueci, 310 F.2d 817, 833, 99 A.L.R.2d 478 (2d Cir. 1962), cert. denied, Guippone v. United States,

372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).

## C

### The Requests to Charge on the Subject of Extortion Were Properly Denied.

Corallo seems to argue that it was Marcus who extorted money from Corallo and Fried. Of course, there is no such proof. There is proof by Fried that D'Angelo and Pizzo extorted $40,000 from Fried by threats of violence to his person. But neither Rappaport nor any of appellants other than Fried testified in his own defense. Marcus and Itkin testified to the bribery conspiracy and Judge Weinfeld in considerable detail told the jury that they could not convict appellants unless they believed Marcus and Itkin, and found established to their satisfaction beyond a reasonable doubt that appellants and each of them had participated in a conspiracy to violate the New York State bribery laws in a manner which reasonably contemplated the use of interstate telephone calls. In the face of this record, and in view of the complete failure of Corallo to make any such fantastic claim during the progress of the trial, we think there was no occasion for Judge Weinfeld in his instructions to mention the subject of extortion, except in connection with Fried's testimony concerning the extortion alledgedly practiced upon him by D'Angelo and Pizzo. These instructions were given and we hold them to be wholly unexceptionable.

At the close of the Government's case counsel for Corallo, in support of his motion for a judgment of acquittal, did claim that what he calls "the defense of extortion" was established as matter of law. *A fortiori*, and for the reasons above stated, this motion was properly denied.

---

3. The requests to charge are so crudely drawn that they do not raise the point argued in Corallo's brief, that "the court refused defendant's request for an instruction requiring the jury to acquit unless there was corroboration of accomplice testimony." No such request was submitted and Request No. 24 is merely to the effect that under New York law the testimony of an accomplice must be corroborated. We discuss the alleged error, however, for the guidance of trial judges in future cases, as the question is likely to arise again.

The requests for instructions to the jury are a motley lot. They are filled with ambiguities, erroneous statements of law and argumentative matter. It is pertinent to recall our admonition, in United States v. Kelly, 349 F.2d 720, 759 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966): "it is not the function of the trial judge to put lengthy, confusing or inaccurate requests for instructions through a winnowing or sifting process in an endeavor to select what is good and reject what is bad." And the very important corollary is: if the judge's charge is comprehensive and accurate "it is not error to refuse to repeat substantially the same or a different statement of the same principles of law in the language submitted by counsel." United States v. Kelly, *supra*, 349 F.2d 720, 760 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966).

In this case Judge Weinfeld's instructions cover every phase of the case comprehensively, the review of the evidence produced by both the Government and the defendants is a model of accuracy and helpfulness to the jury, despite appellants' claims to the contrary, and we find no merit in the contention that there were numerous errors requiring a reversal of the judgment of conviction as against any of the appellants.

### PART III

### AFTER CONSIDERING "ALL THE EVIDENCE IN THE CASE" THE JURY WAS WARRANTED IN FINDING THAT FRIED AND GRAND PARTICIPATED IN THE CONSPIRACY WITH REASONABLE ANTICIPATION THAT THE INTERSTATE TELEPHONE WOULD BE USED BY THE CONSPIRATORS OR SOME OF THEM TO EFFECT THE PURPOSES OF THE CONSPIRACY.

■ Fried claims that there must be direct evidence that Fried made some of the telephone calls to Greenwich, Connecticut, or at least direct proof that he knew that Motto's home was in Greenwich. The basic fault in the reasoning of Fried and Grand lies in their misinterpretation and misapplication of the requirement that Fried's participation in the conspiracy must be established by his own words and deeds and not by the declarations of the other conspirators. Ever since the writing of Judge Learned Hand's opinion in United States v. Dennis, 183 F.2d 201, 230–231 (2d Cir. 1950), affirmed, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), this Court, in a long series of opinions [4] has sought to lay to rest the erroneous supposition that in a joint conspiracy trial the proof sufficient to establish the participation of a defendant in the conspiracy is the same as the proof sufficient to carry the case to the jury as against that same defendant. Proof of the participation of a particular defendant in the conspiracy must be by his own words and acts because such evidence alone will suffice to establish the agency relationship required to warrant the trial court's submission to the jury of all the evidence bearing on the guilt or innocence of a particular defendant, including the declarations of the various persons shown to be co-conspirators.

We have already discussed the abundance of evidence of Fried's own words and deeds that was more than sufficient to warrant a finding that he was a participant. It will serve no useful purpose to add to what we have already

4. United States v. Ragland, 375 F.2d 471 (2d Cir. 1967), cert. denied, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968); United States v. Padilla, 374 F.2d 996 (2d Cir. 1967); United States v. Nuccio, 373 F.2d 168 (2d Cir.), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967); United States v. Stadter, 336 F.2d 326 (2d Cir. 1964), cert. denied, 380 U.S. 945, 85 S.Ct. 1028, 13 L.Ed.2d 964 (1965); United States v. Borelli, 336 F.2d 376 (2d Cir. 1964), cert. denied sub nom. Mogavero v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965); United States v. Stromberg, 268 F.2d 256 (2d Cir.), cert. denied sub nom. Lessa v. United States, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959).

said on this subject. We turn then to a consideration of what the whole record, including the declarations of co-conspirators, discloses as Fried's knowledge of the likelihood of use of the interstate telephone service to and from Motto's Greenwich home by Motto and the other co-conspirators.

Motto was the key man in the conspiracy. It was he who suggested the kickback idea to Marcus in the first place. It was Motto who finally persuaded the others to let him do the negotiating with Fried. It was Motto who arranged for the services of D'Angelo and it was he who acted as the distributor of the various successive instalments of the bribe as they were paid by Fried. That the operations of the conspiracy required secrecy and caution is evident from the different diners, luncheonettes, restaurants and other places in cars or on street corners, often at night, as the prolonged negotiations finally produced agreement on the 5 per cent and the shares allotted to Marcus, Itkin, Motto and Corallo. There were also numerous meetings at various places, attended by varying groups of the conspirators, as the payments were received and passed around, always in cash. The use of the telephone was necessarily almost constant and prolonged. The record is replete with proof of a large number of interstate calls to and from Motto's home in Greenwich where Motto maintained a telephone with an unlisted number. Motto gave this unlisted Greenwich number to Marcus. Itkin, who had worked with Motto on other matters at an earlier time, also had Motto's unlisted number. It is not disputed that Fried also had "a private wire."

Motto also had known Corallo previously and it was he who introduced Corallo to Marcus and Itkin. All these friendships had been formed before the Jerome Park Reservoir question arose. As the whole venture revolved around Motto so it is reasonable to expect that the interstate facilities would be used to keep in touch with Motto, the originator and the moving spirit behind the whole scheme.

Moreover, we think the extensive references in the record to interstate telephone calls that were actually made justify the inference that the use of interstate telephone calls was not a casual and incidental occurrence but the fulfillment of an integral part of the conspiratorial consensus. We do not see how the jury could have found otherwise, considering the extensive evidence of the disputes, not only during the period of negotiation, but also over the time, size and split-up of the pay-offs. It was necessary to keep in touch with Motto to resolve these disputes, and, given the familiarity of the conspirators with Motto, there was sufficient evidence to justify the inference that the conspirators agreed to use the interstate telephone, or reasonably expected to use it in furtherance of the ends and purposes of the conspiracy.

Was there knowing participation by Fried in this conspiracy? Under the authorities to be discussed shortly, this depends upon the degree of participation by Fried and the extent to which he was intimate and on familiar terms with the other conspirators, especially Motto. The greater Fried's involvement in the complicated operations of the scheme and the payment of the various instalments of the pay-off and the greater his intimacy with Motto, the more reasonable is the inference that Fried knew the interstate telephone service would be used or actually was used.

In August, 1966, Motto lunched with Marcus and Itkin and once with Marcus alone. At both these meetings, and especially at the luncheon with Marcus alone, Motto went on and on about how well he knew Fried, how they shared an interest in horses and how "he had known him for a long time, he was a man that had been doing contracts for a long time, over a period of years."

In November, 1966, when Marcus decided to award the contract to Oakhill, Fried called Motto directly to complain of the switch. When Itkin reached

Motto in Connecticut to find the source of the trouble, Motto said:

It's no problem, it's a complete double cross. Henry Fried just called me and told me that he found out that Oakhill was getting the contract.

Similarly, there is much other evidence of continuing direct contacts between Fried and Motto throughout the record. At the mid-December meeting, for example, where Corallo, Itkin and Marcus tried to push Motto for the payment of the money, Motto responded by relating how experienced Fried was, how hard he was to contact, and how he had promised to make a payment of 25 per cent once a rough estimate was made. He said:

Henry has told me I can ask for it and I will have it in a minute's notice.

Fried himself admits that he, D'Angelo and Motto spent a day together in late Spring of 1967, driving up to Fried's horse farm and talking to one another for the whole day. This indicates more than a casual or incidental friendship.

Soon after that, towards the end of May, when the dispute over the amount remaining reached a high point, Motto again indicated that he had seen Fried directly. Motto told Itkin:

You know, you're screaming for another payment, Henry Fried just showed me a little book which shows seven payoffs. Now, what are you talking about? There is very little money left for us.

And a few weeks later, when Motto again met with Itkin and also Corallo and Rappaport, he repeated that Fried had it down in a little book which he had seen.

In July, 1967, when Fried, Itkin and Marcus met at the Commodore on Fried's invitation, Fried, Itkin testified, kept saying how badly the deal was being handled and how there was no reason to work with Motto and Corallo. When Itkin had pressed for the balance due before discussing other deals, Fried replied:

All right, I'll pay Danny Motto the money back within a week.

In August, 1967, when Itkin, Orlando, and Fried met again at the Hotel Commodore, Fried again promised to pay the balance due to Motto—but now the final payment is to be made by the opening of the horse farm on August 20th. And at the opening, Fried said that he had "finished up with Danny."

On December 18, 1967, the various conspirators were summoned to the Federal Grand Jury. On that date Fried made several statements which showed his knowing association with the conspiracy. Marcus saw Fried outside the Grand Jury room, near the elevators, and Fried said to him:

They are on a fishing expedition, they haven't got anything on us.

Itkin testified also that Fried spoke to him in the anteroom to the Grand Jury and that he had been cautioned by Fried:

They'll never get anything on us if we all shut up.

And later that day, while they were waiting in line to be fingerprinted, Marcus testified that Fried said to him:

They haven't got anything on us. If we all keep quiet, we will be all right.

Fried's counsel misread the purport of United States v. Crimmins, 123 F.2d 271 (2d Cir. 1941) and Twitchell v. United States, 313 F.2d 425 (9th Cir. 1963), vacated and remanded sub nom. Rogers v. United States, 376 U.S. 188, 84 S. Ct. 637, 11 L.Ed.2d 603 (1964) (vacated for reconsideration on substantive counts only). These cases distinguish between cases where it is held that a peripheral conspirator, having no knowledge of the operations of the conspiracy as a whole, cannot be convicted without proof indicating some knowledge on his part of the interstate features of the venture, and other cases, such as the one before us now, where the totality of the proofs, including testimony of declarations and acts of co-conspirators in furtherance of the illegal scheme, reveal

the appellant as one who was right in the thick of things as a central member, manipulating and closely supervising the carrying out of the principal object of the conspiracy. In this type of case the proofs are held to be sufficient if the evidence warrants an inference that the particular defendant directly agreed to a scheme in which it was known that the likelihood of use of interstate telephone calls was great. As aptly said in *Twitchell* at page 429: "The degree of knowledge required of the interstate aspect thus increases as the defendant's connection with the core agreement becomes more tenuous." Here the proof of Fried's "connection with the core agreement" is overwhelming. There is nothing tenuous about it.

## PART IV

## THE CONDUCT OF THE TRIAL

### A

The Grand Jury Testimony of Fried and Motto Was Properly Received and It Was Not an Abuse of Discretion to Deny the Motions for a Severance.

### I

Some time ago, and consistently over the years, the Supreme Court has instructed trial judges in no uncertain terms to give clear and explicit limiting instructions during the trial of joint criminal conspiracy cases, so that the jurors would understand those instances where certain evidence is received only as against certain specific defendants and with respect to certain specific issues. Blumenthal v. United States, 332 U.S. 539, 559–560, 68 S.Ct. 248, 92 L.Ed. 154 (1947). We find not the slightest indication in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) that the use of such limiting instructions is to be abolished or curtailed, except in the context of the overruling of the Court's former holding in Delli Paoli

v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), that is to say, in cases where a co-defendant's confession implicating another defendant in the commission of the crime, is received with limiting instructions even though the co-defendant making the confession does not testify and thus afford the confrontation required by the Constitution.

In this case Judge Weinfeld, an able and experienced trial judge, followed the teaching of *Blumenthal* to the letter, and, in our judgment, made his limiting instructions "impregnable." A prime example is his treatment of the testimony of Fried and Motto before the Grand Jury. These two appellants gave no testimony that could even remotely be considered as involving any of the appellants in any wrongdoing whatever, much less as indicating that they or any of them participated in the conspiracy as charged. What Motto and Fried did before the Grand Jury was to tell a variety of brazen lies [5] that served their purpose to conceal their participation in the course of events. It is not contended that any of the other appellants had anything to do with this perjury or that they were in any manner involved in it.

Accordingly, Judge Weinfeld, both at the time this Grand Jury testimony of Fried and Motto was received, and in his instructions to the jury at the close of the case, told the jurors, in the most specific and emphatic manner, that this testimony was received only as against Fried and Motto, respectively, on the issue of the intent of each of these two, separately, and that the jurors must under no circumstances consider any part of this testimony in their determination of the guilt or innocence of the other defendants. This is a far cry from such situations as were presented in *Delli Paoli* and *Bruton*.

We think this Grand Jury testimony was properly received and that

5. Motto denied having anything to do with the pay-off and Fried denied paying money to anyone. Fried said he never heard of Corallo and Motto testified that, ex-

cept for chance encounters, he had known Corallo only years ago when they grew up in the same part of town.

there was no abuse of discretion by Judge Weinfeld when he denied Corallo's motion for a severance. The distinction between this case and the denial of the motion for a severance by appellant Shuck in United States v. Kelly, *supra*, 349 F.2d 720 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966), which we reversed, is of critical importance. In that case voluminous testimony given before the SEC by the principal defendants was entirely devoted to the excoriation of Shuck and a series of accusations that Shuck was the source of various false and fraudulent representations made in connection with his sale of the stock. It took hours to read all this testimony to the jury. None of it was admissible against Shuck, and we found it difficult to see any reason for admitting the testimony at all, as it accomplished no other purpose than to accuse Shuck of misconduct. Moreover, the limiting instructions were of the most perfunctory sort.

Corallo's motion for a severance, made prior to the trial, and based upon what it was feared Rappaport would testify, fell of its own weight when Rappaport gave no testimony at all. In any event, the motion in so far as it referred to Rappaport was wholly lacking in substance. We shall not again refer to the severance feature of the case. All of the appellants were properly joined as defendants and nothing occurred during the trial to require a severance as to any of them.

It is said by some or all of the appellants that the calling of these men to testify before the Grand Jury was mere pretense and a measure of harassment, in order to obtain damaging admissions. If we put ourselves in the position of the prosecutor at the time the subpoenas were served on December 17, 1967, returnable at the United States Courthouse on the morning of December 18, it was apparent from the *ex parte* statements of Marcus and Itkin that the prosecution was dealing with a long, devious and complicated conspiracy, full of scheming and trickery. There had already been a certain amount of running to cover by the various co-conspirators. No investigation would be adequate and in any sense complete without at least an effort to glean some small harvest of information from those suspected of being involved. The prosecutor had by no means wholly developed his case. This was not a case of pressure upon some single, indigent and perhaps ignorant person. All of those who were summoned were sophisticated people, with varying motives to save themselves at the expense of some of the others, if they could, and possessed of information of importance to the prosecution. Several of them were lawyers. Those present were: D'Angelo, Rappaport, Fried, Motto, Corallo, Pizzo, Marcus and Itkin.

Under these circumstances we see no reason for the curtailing of the investigatory powers of the Grand Jury. Indeed, the cases in this Circuit uniformly approve the procedure that was followed here. United States v. Wolfson, 405 F.2d 779, 784–785 (2d Cir. 1968); United States v. Capaldo, 402 F.2d 821, 823–824 (2d Cir. 1968); United States v. Fortunato, 402 F.2d 79, 82 (2d Cir. 1968); United States v. Winter, 348 F.2d 204 (2d Cir. 1965), cert. denied, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965).

## II

It is claimed that the warning required by Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was not given and that the Fifth and Sixth Amendment rights of Fried and Motto were not protected.

In the Grand Jury room, Motto and Fried were separately warned that they had a right to remain silent, that the Grand Jury was investigating the offense of using an interstate facility to further the state crime of bribery of a municipal official, that each was the subject of the investigation, and that he had a right to consult with an attorney. They were also asked whether they had attorneys present. Fried said he did, Motto said he did not. Finally, they

were told whatever they said might be used against them. We have set forth the full warnings in the margin.[6] These warnings were completely adequate.

Motto has filed a Supplemental Appendix containing an *ex parte* affidavit by Mr. LaRossa, one of his counsel during the trial of this case. This affidavit was used in support of a motion on Motto's behalf to dismiss the indictment because, according to LaRossa's statements "on information and belief"

---

6. Grand Jury warnings to Daniel Motto:
" 'Q. Please state your name. A. Daniel Motto, M-o-t-t-o.

Q. And your address. A. 121 Birch Lane, Greenwich, Connecticut.

Q. Mr. Motto, let me advise you that the grand jury before you is investigating alleged violations of Title 18, United States Code, Section 371. That section makes it a crime to conspire to commit any crime against the United States, to commit any offense against the United States.

There is also a Section 1952 of the same Title which makes it a crime to use any interstate facility or telephone or to travel, or the mails, in furtherance of certain particular State offenses. In this case the State offense that the grand jury is investigating is the offense of bribery of a local official, namely a municipal official. Do you understand that? A. Yes.

Q. And it's investigating conspiracy concerning this. I do want to advise you that you have a right to refuse to answer any questions the grand jury may ask you today the answers to which you feel they tend to incriminate you personally. Do you understand what I just said? A. Yes.

Q. However, should you answer questions, those answers could be used against you in a court of law or otherwise in the future.

[At that point the witness nodded.]

Q. You also have the right to consult with an attorney. You understand that? A. Yes, sir.

Q. Do you have an attorney here today? A. No.

Q. Let me also advise you that you are a subject of the investigation of this grand jury. Do you understand that? A. Yes, sir.

Q. How long have you lived in Greenwich, Connecticut?
*　*　*　*　* ' "

Grand Jury warnings to Henry Fried:
" 'Q. Would you please state your full name? A. Henry Fried.

Q. Where do you reside? A. I have a city address at 301 East 66th Street, but I spent most of my time up at Somers, New York.

Q. Mr. Fried, are you the president of S. T. Grand & Company? A. I am; yes, sir.

Q. What is the nature of the S. T. Grand & Company's business? A. General Construction, pipe work; we're mostly watermain contractors, and occasionally, if my engineers see a job that they may be interested in, we bid on some structural work also.

Q. Let me advise you initially, Mr. Fried, that this Grand Jury is investigating alleged violations of the Federal Criminal Code, Section 371 and Section 1952, which in effect involves an alleged conspiracy to commit the state crime of bribery of a local official. And in connection with that, certain—use of certain interstate facilities used in connection with that crime; do you understand that, generally? A. I do, sir.

Q. I want to advise you that you have a right to consult an attorney; do you understand that? A. Yes, sir.

Q. Do you have an attorney who's sitting outside right now? A. I have, sir.

Q. What is his name? A. Mr. Cassese.

Q. How do you spell that name? A. I think it's Cassese. (spells)

Q. I want to advise you also that we're going to propound questions to you, and that you have a right to refuse to answer any questions which might be asked of you where you feel the answer to the question would tend to incriminate you personally; do you understand that? A. Yes, sir, I do.

Q. In addition, any answer you do give may be used against you in a court of law in the future. You understand that? A. Yes, sir.

Q. I also want to advise you, Mr. Fried, that you are a possible subject of this investigation; do you understand that? A. Possible subject? I'd like you to explain that, sir, if you will.

Q. That means that the allegations are such that the Grand Jury is contemplating—or, are in the process of investigating an alleged bribery of which you may be a part; do you understand that? A. I understand that.

Q. That is as clear as I can make it. A. Right.

Q. Now, you state you are the president of S. T. Grand & Company?
*　*　*　*　* ' "

D'Angelo was Motto's lawyer when they were summoned with the others to testify before the Grand Jury on December 18, 1967, and D'Angelo had failed to "advise Motto of his Constitutional rights with regard to testifying before the Grand Jury." We are at a loss to perceive the pertinency of this, in view of Motto's testimony before the Grand Jury that he had no lawyer.

■ The *Miranda* rule has no application to the circumstances of this case. It is hornbook law that witnesses called to testify before a Grand Jury have no right to the presence of a lawyer to object to questions or act as counsel. The practice of permitting counsel to sit in the anteroom to give advice if the witness so desired was followed here in the case of Fried, and Motto, as we have said, testified he had no lawyer and he made no request that he be given an opportunity to get a lawyer.

None of those summoned to appear were in custody nor were they put under any restraint. Moreover, the Grand Jury proceedings were conducted under the supervision of a District Judge, who, it may be assumed, was at all times available for rulings on objections by any of the witnesses.

The plain truth of the matter is that the predicament of Fried and Motto was in no sense due to any deviation from duty by the prosecutor, but solely to the overconfidence and arrogance which led them to believe they could lie themselves out of trouble.

### B

We Find Nothing Improper or Prejudicial in Certain Comments by the Trial Judge.

During the cross-examination of Groopman counsel for Fried established the fact, which so far as we can see was never seriously questioned by any of the parties, that the City's engineers regarded Grand as the best qualified contractor to do the Jerome Park Reservoir job. Nevertheless, the documentary evidence made it quite clear that Marcus went to the very brink of awarding the contract to Oakhill, another contractor whose qualifications were also approved. With what seems to us to be undue liberality the trial judge permitted a lengthy and repetitious rehearsal of what a fine construction company Grand was. Finally, counsel for Fried produced a magazine article, not written by Groopman, and at first sought to read portions of the article into evidence, but finally he withdrew the exhibit. In the course of the ensuing colloquy, the trial judge said: " * * * under the terms of the indictment as cast, it wouldn't make very much difference whether one was more qualified than the other." Later, in other colloquies, this remark was repeated. Although the question was not raised by any proper motion or objection at the trial, we are asked to notice these comments as "plain error."

While the uncontradicted proof is that Grand was "fully qualified to perform this job," it was not and could not reasonably be claimed by Fried and Grand that no other construction company was qualified or that the job had to go to Grand. Moreover, Marcus alone had the power to award the contract, and, but for Itkin's vigorous opposition and fear of the consequences, Marcus would have awarded the contract to Oakhill.

■ The comments by the trial judge were fully justified and bear not the slightest resemblance to the prejudicial comments discussed in the cases cited in the main brief of Fried and Grand.

### C

In View of the Direct Examination of Fried and His Testimony on Cross-examination by Counsel for Other Appellants to Which No Objection Was Raised on Fried's Behalf It Was Proper for the Trial Judge to Ask Fried Whether Prior to the Trial He Had Informed the Prosecutor That Part of His Testimony Before the Grand Jury Was False.

██ We have already discussed under the heading of Corallo's so-called Extortion Point the testimony of Fried, on direct examination, to the effect that D'Angelo and Pizzo forced him to pay D'Angelo $40,000 by putting Fried in fear for his life. Later on, in his direct examination, Fried elaborated on this theme for the obvious purpose of explaining his reason for falsely stating to the Grand Jury that he had paid no money to anyone. Thus he said Joe Pizzo came up to him just before he entered the Grand Jury room and said:

> Commish, you are going into the grand jury room, and you want to make God damn sure you testify no money was passed or you are apt to find your body in an empty lot.

This was supposed to be Fried's reason for lying to the Grand Jury; and he said in effect that he had not intended to testify at the trial but changed his mind when the threat of physical injury to his person by Pizzo was removed by Pizzo's death in April, some little time before the trial commenced in June, 1968.

When cross-examined by Corallo's counsel, and without objection, Fried freely answered questions about why he had not reported the "extorsive" incident to his friend Garelik, a high ranking police official. He testified: "I did not because I was fearful of Joe Pizzo. I knew what it would mean if I did mention it."

At the close of the entire cross-examination, Judge Weinfeld interrogated Fried as follows:

> The Court: When did it come to your attention that Joe Pizzo died?
>
> The Witness: Some time in April.
>
> The Court: Of this year?
>
> The Witness: Of this year.
>
> The Court: That was about four months after you say you lied before the grand jury because of the threat?
>
> The Witness: That's right.

> The Court: After Joe Pizzo died, did you ever communicate with the United States Attorney and request that your grand jury testimony be changed to set forth the true version of what had occurred?
>
> The Witness: No, sir.
>
> The Court: After the death of Joe Pizzo, did you ever tell the United States Attorney that you had lied?
>
> The Witness: I never did.
>
> The Court: If there are no other questions, the witness may step down.

This testimony, given without objection, is claimed by Fried to be in violation of Fried's Fifth Amendment rights, despite the clear waiver of such rights by Fried's testimony on direct examination.

The alleged violation of Fried's Sixth Amendment rights is an equally frivolous contention. After Mr. Donati, Fried's counsel, had called a character witness, he decided to try to soften the effect of Fried's admission that, even after the threat of violence was removed by Pizzo's death, he had not informed the prosecutor that his Grand Jury testimony was false. And so he withdrew the character witness. In a conference at the bench Mr. Donati followed the propensity he had displayed on various occasions during the trial to make improper *ex parte* comments in lieu of testimony. So, Mr. Donati proceeded to tell Judge Weinfeld that "we," meaning himself and Fried, "had a decision to make * * * and that was a lawyer's decision" with more to the general effect that he and not Fried was responsible for the decision not to inform the prosecutor that Fried's testimony before the Grand Jury was false. And this in the face of previous testimony by Fried, to which his counsel made no objection, that he had made no effort to report the alleged extortion to the "authorities" and his attorneys had not suggested that this be done. Indeed, after this testimony had been given by Fried, Mr. Donati objected "to this whole line of testimony," and his objection was

sustained, evidently upon the ground of the privileged relationship between attorney and client. Against this background, and without any motion, objection or effort to raise the question for appellate consideration, we find there is no alleged Sixth Amendment violation before us for decision. Viewed from any angle the claim of deprivation of Fried's right to the effective assistance of counsel is wholly lacking in substance. Judge Weinfeld's questions constituted no more than a perfectly proper attempt to clarify testimony already given, without objection, by Fried.

The jury evidently found that Fried lied before the Grand Jury and that he also lied at the trial. It may well be that Pizzo's death gave Fried what may have seemed to him to be a good opportunity to invent a new version, bearing some slight resemblance to the facts as testified to by Marcus and Itkin. But it strains credulity to the breaking point to picture Fried and his lawyer seriously debating together the "legal" question of whether they should let the prosecutor know in advance of the trial that Fried was going to change his story.

### Conclusion

We have carefully examined numerous additional claims made by one or another or all of the appellants concerning alleged erroneous and prejudicial rulings and we find no merit in any of them.

And so the sorry story of the corruption of a public official comes to a close. We see politicians hovering in the background, a labor leader as the master of ceremonies and underworld characters weaving a web of intrigue in the midst of secrecy and stealth. These sinister figures chisel in on one another in the fixing of their respective shares of the loot, and finally submit to the power of one who wanted his share "from off the top." This record reeks with proof of the guilt of every one of those whom the jury found guilty as charged.

Affirmed.