**UNITED STATES of America, Plaintiff,**

v.

**George TUCKER and Super Dupers, Inc., Defendants.**

**No. 79 CR 20.**

United States District Court,
E. D. New York.

June 29, 1979.

---

*Memorandum of Decision and Order*

PLATT, District Judge.

Defendant, George Tucker, President and Chief Executive Officer of Super Dupers, Inc., has been charged in Count One of a twenty-one count indictment with violating Title 18, United States Code, Section 1962(c) by participating in the conduct of the affairs of an enterprise engaged in interstate commerce through a pattern of racketeering activity which included counterfeiting sound recordings and selling them as the product of the recording companies identified on the labels of said recordings. He has also been charged in Counts Two through Ten with nine instances of employing interstate wire communications for the purpose of executing the aforesaid fraudulent scheme, in violation of Title 18, United States Code, Section 1343. In Counts Eleven through Twenty-One, defendants George Tucker and Super Dupers, Inc., have been charged with reproducing and distributing for profit eleven copyrighted sound recordings without authorization from the respective copyright owners, in violation of Title 17, United States Code, Sections 106(1) and (3) and 506(a).

On November 27, 1978, United States Magistrate William J. Hunt (District of New Jersey) issued search warrants based on the affidavit, dated the same day, of Special Agent Robert F. Levey of the Federal Bureau of Investigation ("Levey Affidavit"). The warrants authorized the search of the premises of Super Dupers, Inc., and of George Tucker's residence,[1] and the seizure of counterfeit and pirate[2] phonorecords of copyrighted sound recordings as well as related equipment and documents found therein. On December 6, 1978, federal agents executed the warrants. Although they found no evidence of the alleged criminal activity at George Tucker's home, they seized over one thousand record albums,

Edward R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, for plaintiff; Max Sayah, Brooklyn, of counsel.

Brown & Brown, Jersey City, N. J., for defendant Tucker; Henry Furst, Jersey City, N. J., of counsel.

Alan Silber, East Orange, N. J., for defendant Super Dupers.

---

1. A third warrant authorized the search of a third location not directly relevant here. *See* n.6, *infra.*

2. According to subparagraph 5(2)(I) of the warrant affidavit, record piracy is the "unauthorized duplication of sounds contained in a legiti-

mate recording." In subparagraph 5(2)(II), counterfeiting is defined as the "unauthorized duplication not only of the recorded sounds, but also of the original label, art-work, trademark and packaging of the original recording."

over two thousand eight-track tapes, over thirty thousand recording labels, various business records and documents, and numerous machines and related recording equipment at the corporate defendant's premises. Defendants have now moved, *inter alia*, to suppress the evidence so seized on the grounds that it was obtained in violation of their Fourth Amendment right to be free from unreasonable searches and seizures.

Defendants argue that the affidavit in support of the search warrant failed to set forth facts and circumstances from which the Magistrate could conclude that probable cause existed; that the information contained in the affidavit was too "stale" to support a finding of probable cause; that the Government made intentional false statements in the affidavit; and that Counts Two through Ten should be dismissed as based on contrived jurisdiction.[3]

### I.

Defendants contend that the Levey Affidavit fails to state facts sufficient to show probable cause for the issuance of a search warrant because it fails to meet the standards set forth by the Supreme Court in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). In particular, defendants assert (Brief [sic] in Support of Defendants' Motion to Suppress ("Defendants' Memorandum") at 3) that the affidavit, which contains information provided by informants, fails to "set forth 'some of the underlying circumstances' forming the basis of the informants [sic] conclusion that ille-

gal activity is afoot," fails to "state facts which give some assurance that the informant is a credible person," and fails to state facts which give some assurance "that the informants [sic] information has been obtained in a reliable manner." The government concedes (Memorandum in Opposition to Defendants' Motions to Suppress and Dismiss ("Government's Memorandum") at 2) that "the case law is clear and for the purposes of this point is not in dispute," but disagrees with defendants' formulation and application of the *Aguilar-Spinelli* test.

■ Although the Court finds that neither side has correctly stated or applied the *Aguilar-Spinelli* formula, we agree with the Government that defendants' challenge lacks merit. In *Aguilar v. Texas, supra*, 378 U.S. at 114, 84 S.Ct. at 1514, the Supreme Court set forth a two-prong test, the second prong of which is phrased in the alternative:

"Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, see *Rugendorf v. United States*, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887, was 'credible' or his information 'reliable.'" (Footnote omitted).

---

**3.** In Point IV of their moving papers, defendants argued that all cassette duplication equipment seized should be returned because the search warrant was only concerned with eight-track duplicating equipment. Although the United States Attorney disputed this contention, the government agreed to return certain items to the defendants. In the meantime, however, three recording companies have brought suit against defendants and others for copyright infringement (*RCA Corp. et. al. v. George Tucker et al.,* Docket No. 79 C 983) and, in connection therewith, have applied pursuant to Title 17, United States Code Section 503(a)

for the impoundment of the items seized by the F.B.I. Accordingly, at this Court's request, the Government has retained possession of all items seized pending a decision on the application for a writ of seizure. In any event, defendants' assertion (Affidavits of Alan Silber, Esq. and George Tucker dated April 4, 1979 at 3 and 2 respectively) that the machinery seized could not produce counterfeit "pancakes" or eight-track tapes are evidentiary issues to be decided at a trial. If, as defendants maintain, some or all of the machinery seized has no relation to the charges on which defendants have been indicted, there is no need to suppress it.

In paragraphs 19, 20, 26 and 28 of his affidavit, Special Agent Levey identified three informants who supplied him with information concerning defendant George Tucker. Ray and Florence Sexauer as well as Byron Hawley indicated to Levey not only that George Tucker manufactured counterfeit recordings, but that the defendant "was placing his duplicating equipment into the basement of a new home." In his affidavit, Levey stated that these informers "are personally known to me to be major counterfeit and pirate eight-track tape manufacturers who have told me that they have dealt with TUCKER on a regular basis." The Levey Affidavit, containing as it does information supplied by named informants and gleaned from personal contact with defendant Tucker, is distinguishable from the affidavits involved in *Aguilar* and *Spinelli*. As the Court noted in *Aguilar, supra,* 378 U.S. at 113, 84 S.Ct. at 1513:

"The affidavit here not only 'contains no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein,' it does not even contain an 'affirmative allegation' that the affiant's unidentified source 'spoke with personal knowledge.'"

The Government also relied on a confidential informant in *Spinelli, supra,* 393 U.S. at 416, 89 S.Ct. at 589:

"The tip does not contain a sufficient statement of the underlying circumstances from which the informer concluded that Spinelli was running a bookmaking operation. We are not told how the FBI's source received his information—it is not alleged that the informant personally observed Spinelli at work or that he had ever placed a bet with him."

As for the second prong of the *Aguilar* formula, we find that the warrant affidavit indicated "some of the underlying circumstances" from which he concluded that his named informants were "credible." As noted earlier, both the Sexauers and Byron Hawley were personally known by the affi-

ant to be major counterfeit and pirate eight-track tape manufacturers; Levey further stated in paragraph 20 that Ray Sexauer "is known to me, through personal conversations and meetings, as being the largest manufacturer and distributor of pirated tapes in the northeastern United States." As the United States Attorney points out with respect to the credibility of these informants (Government's Memorandum at 5):

"[T]his was a case in which an undercover agent was dealing 'in the trade' with those named individuals, (Sexauer and Hawley), who had no motive to lie to one whom they thought was a partner in the massive corrupt enterprise."

Thus, the warrant affidavit satisfies the first prong of the *Aguilar* test concerning the basis of the informants' information as well as the second prong concerning the credibility of the informants.

■ Even if one assumes, *arguendo,* that the affidavit is somehow inadequate under *Aguilar,* it satisfies the more elaborate test set forth in *Spinelli v. United States, supra,* 393 U.S. at 415, 89 S.Ct. at 588:

"The informer's report must first be measured against *Aguilar's* standards so that its probative value can be assessed. If the tip is found inadequate under *Aguilar,* the other allegations which corroborate the information contained in the hearsay report should then be considered. At this stage as well, however, the standards enunciated in *Aguilar* must inform the magistrate's decision. He must ask: Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration?"

In the case at bar, the informants' reports were only a small portion of the information establishing probable cause to believe George Tucker was engaged in illegal activities.[4] The bulk of the affidavit for search

---

4. The issue of whether the Levey Affidavit established probable cause to believe that evidence of a crime would be found on the premis-

es of Super Dupers, Inc., was also raised by defendants in oral argument and is discussed in Part III of our opinion.

warrants details the affiant's participation in a long-term investigation into criminal violations of the Copyright Law, the affiant's expertise, and the personal observations made by the affiant and other F.B.I. and industry investigators. In paragraphs 3 and 4, Special Agent Levey spent twenty months exclusively assigned to a joint F.B. I.-Justice Department-Organized Crime Strike Force investigation; that he had received extensive training from the F.B.I. and a recording industry association; that he worked in an undercover capacity out of a retail record store opened in Westbury, New York by the F.B.I. as a "front" or base of operation; and that in that capacity he had had "repeated contacts and conversations with over fifty subjects involved in the counterfeiting and pirating of copyrighted sound recordings." Paragraphs 9, 11, 12, 13, 14, 15 and 16 cover the period between February and June of 1978 and relate the substance of various personal meetings and conversations between the affiant and George Tucker, as well as specific "buys" of pirated or counterfeited sound recordings.[5]

However, independent investigation provided apparent corroboration of two details of the informants' tips. In paragraphs 20 and 26, Levey states that Ray Sexauer told him that one Celso Rivera was also engaged in recording piracy and counterfeiting, that Rivera did work for George Tucker, and that "if [Levey] knew where his [Rivera's] house is, [Levey]'d know better" where Rivera's operation was located. In paragraphs 21 through 25 and 27, Levey laid out the independent investigative steps which led him to conclude that Celso Rivera was engaging in illegal activity at an address listed on his driver's license as his resident address.[6] As stated earlier the Sexauers and Byron Hawley told Levey that defendant Tucker "was placing his duplicating equipment into the basement of a new home he was building" (paragraph 19). On November 24, 1978, Ray Sexauer advised Levey "that Tucker had just moved his duplicating equipment to his new location" (paragraph 28a). In paragraph 28, Levey states that he was informed by Special Agent Warren M. Flagg of the F.B.I. that through his investigation and confidential sources he had determined the location of George Tucker's former residence and that on November 20, 1978, through a physical surveillance of said location, he had determined the location of Tucker's new residence.

Thus, the court finds that the informants' reports are trustworthy as measured against *Aguilar's* standards and have been sufficiently corroborated by independent sources to satisfy the *Spinelli* test.

## II.

Defendants argue that the information relied upon in the Government's affidavit was so dated that any probable cause had dissipated by the time the warrant was issued for a search of the premises of Super Dupers, Inc.

■ Defendants correctly state (Defendant's Memorandum at 6) that "probable cause to justify the issuance of a search warrant must exist at the time the warrant is issued. *U. S. v. Boyd,* 422 F.2d 791 (6th Cir. 1970); *Sgro v. U. S.,* 287 U.S. 206 [53 S.Ct. 138, 77 L.Ed. 260] (1932)." Applying this principle to the case at bar, defendants assert (Defendants' Memorandum at 9–10):

"In the instant case, the Affidavit was made and the search warrant issued on November 27, 1978. The only information with respect to the alleged criminal activity of the defendants was obtained from February 22, 1978, to June, 1978, approximately 5 months prior to the issuance of the warrant. Moreover, the

---

5. Although defendants contest the accuracy or the veracity of some of the information contained in paragraphs 9 and 11–16, even if one considers only the uncontested statements and purchases and the informants' reports, the affidavit shows probable cause. See Part III of this opinion.

6. The "rear building" at 123 Orchard Street in Elizabeth, New Jersey was the third location for which a search warrant was issued. *See,* n. 1, *supra,* and accompanying text.

information contained in paragraphs 17–28(a) is based on unsupported hearsay information (Point I, *supra*) and therefore insufficient under any standards to support a finding of probable cause. *Aguilar v. Texas, supra, Spinelli v. United States, supra.*"

However, as we have already held, the informants' tips dating from July 5, July 24 and November 22, 1978 are sufficient under both *Aguilar* and *Spinelli* to support a finding of probable cause and update Special Agent Levey's personal observations.

 Furthermore, as defendants themselves acknowledge at some length (Defendants' Memorandum at 7–9), the freshness of the information relied upon by the Government is not automatically dispositive in the probable cause analysis. In a passage quoted by defendants, the Court of Appeals for the Tenth Circuit stated, in *United States v. Neal*, 500 F.2d 305, at 309 (1974):

> "The Fourth Amendment contemplates that probable cause for the issuance of a search warrant must exist at the time the search is sought to be made. Probable cause existing at some time in the past will not suffice unless circumstances exist from which it may be inferred that the grounds continued to the time the affidavit was filed." (Citations omitted).

Defendants also quote the following passage from an earlier opinion by the same Court of Appeals in *United States v. Johnson*, 461 F.2d 285, at 287 (10th Cir. 1972):

> "Initially, it should be noted that the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit. Together with the element of time we must consider the nature of the unlawful activity. Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous

nature, a course of conduct, the passage of time becomes less significant."

*See also, Mapp v. Warden, New York State Corr. Inst., etc.*, 531 F.2d 1167, at 1172 (2d Cir. 1976), *cert. denied* 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976). Clearly, in the case at bar, the affidavit "recites facts indicating activity of a protracted and continuous nature, a course of conduct" on the part of defendant George Tucker.

### III.

 In the third and final point of their motion to suppress, defendants contend that the Government knowingly and intentionally made false statements in the search warrant affidavit and that they should be granted an evidentiary hearing under the Supreme Court's ruling in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Defendants initially challenged (Defendants' Memorandum at 14–15) the veracity of four passages of the Levey Affidavit. The first two passages singled out by defendants were subparagraphs 6C and 6D of Part C of the affidavit, "IDENTIFYING CHARACTERISTICS OF COUNTERFEIT/PIRATE SOUND RECORDINGS." As the Government correctly stated in opposition to defendants' motion (Government's Memorandum at 6–7), these statements are "part of the overall introductory material affirmed by Agent Levy [sic] as part of his intensive experience" and have "no bearing on the facts leading to probable cause as to these defendants." Defendants appear to have conceded as much because they made no mention of these statements at oral argument.

Indeed, at oral argument, defense counsel focused on paragraphs 8 through 18 of the warrant affidavit. On that occasion, defendants argued that "the affidavit falls far short of establishing probable cause" to believe that the items listed in the search warrant would be found on the premises of Super Dupers, Inc. (Tr. 3–9).[7] If one accepts Special Agent Levey's affirmations as true, the aforementioned paragraphs relate

---

7. The numbers in parenthesis (Tr. 3–9) refer to pages in the stenographic transcript of the oral argument on defendants' motions heard April 4, 1979.

the observations, conversations, and purchases on the occasion of his various meetings with George Tucker, which included at least three visits to Super Dupers, Inc. in New Jersey. Taken as a whole, the content of these paragraphs affords ample reason to believe that a search of the premises might produce copies of the counterfeit recordings which Agent Levey knew George Tucker was selling in very heavy volume as well as materials or equipment used in their manufacture and distribution.

However, some of the statements contributing to the probable cause for the search of the Super Dupers, Inc.'s premises must also be considered in the context of defendants' demand for a *Franks* hearing. Paragraphs 9 and 11 through 17 of the affidavit outline various meetings, conversations, and transactions between Special Agent Levey and George Tucker occurring between February and June of 1978. Defendants challenge the veracity of several of the statements contained therein on the basis of tape recordings of the conversations which the United States Attorney has turned over to defense counsel and which defendants have urged the Court consider in reviewing their request for an evidentiary hearing.[8]

In *Franks v. Delaware, supra*, 438 U.S. at 155–156, 98 S.Ct. at 2676–77, the Supreme Court ruled that, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." Even assuming, *arguendo*, that the defendants at bar have overcome the presumption of validity with respect to the affidavit supporting the search warrant by a substantial preliminary showing that the affidavit is tainted by deliberate falsity or a reckless disregard for the truth, we find that (438 U.S. at 171–172, 98 S.Ct. at 2685), "when [the] material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause."

Even without the challenged material, the uncontested portions of the affidavit reveal that immediately prior to meeting with defendant George Tucker on February 22, 1978, Agent Levey purchased four winders[9] which were stored at Super Dupers, Inc. and that the affiant then met with George Tucker who discussed the costs charged by him in providing counterfeit pancakes.[10] Later that same in week in February of 1978, Special Agent Levey purchased counterfeit pancakes of "Saturday Night Fever" at ten dollars ($10.00) each from George Tucker.

On March 15, 1978, the affiant purchased from George Tucker thirty pancakes consisting of ten each of three different counterfeit selections.[11] One week later, the

---

8. *See* Defendants' Memorandum at 16; Affidavit of Alan Silber, Esq., dated April 4, 1979 at 2; and Tr. 10–11. The United States Attorney submitted to this Court on April 24, 1978 the transcripts of ten tape recorded conversations. An eleventh transcript was submitted April 25, 1979. These did not include a transcript of the March 15, 1978 conversation referred to in paragraph 12 of the Levey Affidavit.

9. According to subparagraph 5(13) of the Levey Affidavit, a winder is a "machine used to take the prerecorded tape from the pancakes, cut it and put it onto spools that are inserted into the cartridges or cassettes." For the definition of the term "pancake," *see* n. 10, *infra*.

10. According to subparagraph 5(12) of the Levey Affidavit, a pancake is a "large roll of as much as 8400 feet of magnetic recording tape,

measuring up to 14 inches in diameter, which, when recorded upon a slave [a machine which duplicates at high speed multiple copies of the recording contained on a master] and cut up into individual albums, will fill as many as fifty eight-track cartridges."

11. According to paragraph 12 of the Levey Affidavit, on March 15, 1978 defendant George Tucker also advised Agent Levey that he could provide the undercover agent with finished eight-track products "in order to make 'life a little easier.'" Defendants contend (Affidavit of Alan Silber, Esq., dated April 4, 1979 at 4) that "[t]he tapes reveal that there was no discussion of finished products and that what would 'make life a little easier' was, was [sic] label copy for pancakes." According to subparagraph 5(17) of the Levey Affidavit, a label

affiant purchased from George Tucker an additional twenty counterfeit pancakes of yet a fifth sound recording. On April 14, 1978, he paid George Tucker one thousand dollars ($1,000.00) in cash for one hundred and twelve "master" reels utilized in the production of counterfeit pancakes. He met again with George Tucker on June 8, 1978, at which time the defendant "stated that he was responsible for distributing over 200,000 counterfeit 8-track tapes of 'Saturday Night Fever' to major retail outlets" and that he was "producing and distributing an equally high volume" of three other recordings. On three separate occasions in the month of June 1978, Agent Levey purchased "large quantities" of these counterfeit eight-track tapes from George Tucker. Finally, the affiant states that "Special Agent RICHARD J. ROGERS has advised me that on at least seven different occasions GEORGE TUCKER has attempted to telephonically make contact with me at the 'Store' regarding the above transactions."

In contesting paragraph 9 of the warrant affidavit, defendants concede (Defendants' Memorandum at 15 and Affidavit of Alan Silber, Esq. at 2) that when asked by agents whether he knew "a good guy for labels" George Tucker answered that he knew "the best" and that George Tucker later discussed what prices the printer charged. With respect to paragraph 11 of the Levey Affidavit, defendants concede (Affidavit of Alan Silber, Esq. at 2–3) that George Tucker showed Agent Levey samples of six different counterfeit recordings and told the agent that he knew a third party who had for sale four thousand cassettes of each of those recordings. With respect to paragraph 12, defendants concede (Affidavit of Alan Silber, Esq. at 4) that George Tucker advised Special Agent Levey that he could provide the latter with label copy for pancakes in order to "make life a little easier."

■ Clearly, the uncontradicted portions of the warrant affidavit [12] and defendants' concessions would be more than sufficient to give a Magistrate probable cause to believe that George Tucker was engaged in an ongoing criminal enterprise. We find that this same material is also sufficient to support probable cause to search the premises of Super Dupers, Inc. The court is mindful that "affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion" and that, "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded warrants," *United States v. Ventresca*, 380 U.S. 102, at 108 and 109, 85 S.Ct. 741, at 746, 13 L.Ed.2d 684 (1965).

■ As the Court of Appeals for the Ninth Circuit stated in *United States v. Spearman*, 532 F.2d 132, at 133 (9th Cir. 1976):

"We recognize that probable cause to believe a person is guilty of a crime does not always constitute probable cause to search any property belonging to him. However, we have upheld many searches where

the nexus between the items to be seized and the place to be searched rested not on direct observation . . . but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property.

*United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970) (citations omitted). *See also United States v. Mulligan*, 488

---

is a piece of paper affixed to the inner portion of a disc recording or to the outside of the pre-recorded tape cartridge or cassette housing "on which are imprinted the name and trademark of the manufacturer, the identity of the performer, the selections contained in the re-

cording and any other information necessary to identify the content of the recording."

12. This evidence of criminal activity is generally corroborated by tips provided by three informants. See Part I of this opinion.

F.2d 732, 736 (9th Cir. 1973), *cert. denied*, 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974); *United States v. Mahler*, 442 F.2d 1172, 1174–75 (9th Cir.), *cert. denied*, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971)."

Even if one sets to one side the personal observations on the part of Special Agent Levey which defendants challenge, defendants do not dispute that on the occasion of his first visit to Super Dupers, Inc., Agent Levey bought four winders and immediately thereafter discussed with George Tucker the latter's charges for providing counterfeit pancakes. Given the remaining and extensive evidence that George Tucker was heavily engaged in the manufacture and/or distribution of counterfeit sound recordings, and given the fact that he was President and Secretary of a company presenting itself to the public as "a corporation to produce educational cassettes" (Affidavit of George Tucker dated April 4, 1979 at 1), it would be perfectly permissible to infer that evidence of his criminal activities would be found on the premises of Super Dupers, Inc.

Since the uncontested portions of the Levey Affidavit support a finding of probable cause, no hearing is required. *Franks v. Delaware, supra,* 438 U.S. at 171–172, 98 S.Ct. at 2685.

### IV.

Defendant George Tucker has also moved to dismiss Counts Two through Ten of the indictment on the grounds that "[t]he basis for these Counts are all calls that were placed *to* Tucker at his office *by* Special Agents of the Federal Bureau of Investigation" and that these calls "provide the sole basis upon which federal jurisdiction was obtained, or rather, contrived" (Defendants' Memorandum at 18). While defendants do not dispute that the Government can sustain a charge of violating the wire fraud statute even when the defendant merely receives a call, they argue that the government cannot obtain federal jurisdiction over alleged criminal activities based entirely upon the activity of its own agents.

Defendants liken the instant case to the situation in *United States v. Archer,* 486 F.2d 670, at 683 (2d Cir. 1973), wherein the court reversed defendants' convictions "for insufficiency of the evidence to show a violation of, or a conspiracy to violate, the Travel Act, with instructions to dismiss the indictment." In *Archer,* the court considered three sets of telephone calls which the Government claimed brought the case within the purview of Section 1952(a)(3) of Title 18, United States Code. The first call was made to one of the defendants in New York City by a federal agent who, "on instructions from an Assistant United States Attorney, went to a hotel in Newark, N.J., admittedly for the sole purpose of having [the defendant] talk in an interstate telephone call." The court (486 F.2d at 681) "discarded" this incident holding that "[w]hatever Congress may have meant by § 1952(a)(3), it certainly did not intend to include a telephone call manufactured by the Government for the precise purpose of transforming a local bribery offense into a federal crime."

However, the telephone calls at issue here are clearly distinguishable from the New Jersey-New York telephone call in *Archer.* Special Agent Levey and his colleagues, unlike the federal agent in *Archer,* did not deliberately establish their undercover base of operations in New York for the sole purpose of engaging George Tucker in, or enticing George Tucker to initiate, interstate telephone calls. As the United States Attorney and Special Agent Levey note (Government's Memorandum at 9–10 and Affidavit of Robert B. Levey dated April 4, 1979 at 1–2), the agents dealing with these defendants were engaged in an investigation into illegal operations which covered the entire Eastern portion of the United States and, on the date of the execution of the search warrant on the premises of Super Dupers, Inc., other seizures were made at a total of nineteen locations in five states. There was nothing impermissible about the Government opening in Westbury, Long Island a record store as a "front" for their undercover agents; nor does the law require that the Government

establish such an operation in each State in which it wishes to investigate suspected criminal activity in order to negate any conceivable inference of contrived or manufactured jurisdiction.

In *Archer*, the Court of Appeals also considered a set of telephone calls made by one of the defendants from New York City to Las Vegas, Nevada. When asked by a defendant how he would be reached in Las Vegas if it became necessary, the federal agent had "responded that he could be contacted by paging at the Sahara Hotel or, if that did not succeed, by leaving a message with the hotel telephone operator" (486 F.2d at 673). In fact, the agent, who was posing as a Las Vegas mobster, had no contacts whatsoever with the hotel. The court (486 F.2d at 682) "refuse[d] to construe the 'intent' language of § 1952 so broadly as to include a call to an innocent telephone operator who had not the faintest idea of what was afoot" (footnote omitted). That situation is not analogous to the one before this Court.

▆ Defendants do not contend that the nine telephone calls in question here could not have served to promote the racketeering activity set forth in Count One of the indictment. Nor is it grounds for a dismissal of Counts Two through Ten that defendant George Tucker was speaking to federal agents who were not truly culpable accomplices but were operating on an undercover basis in an effort to apprehend criminals. Were such logic to prevail, the courts would, for instance, have to reverse the convictions of all persons who had sold narcotics to undercover agents or informants.

▆ Finally, defendants concede (Defendants' Memorandum at 19–20) that George Tucker himself initiated telephone calls from New Jersey to undercover agents operating in New York, but argue that said calls were merely "a casual and incidental occurrence" such as the Court of Appeals found insufficient to give rise to federal jurisdiction in *Archer*. There, the undercover agent, who had gone to France on a genuine narcotics investigation, telephoned from Paris a defendant in New York City on a prearranged date. The court found (486 F.2d at 683):

"The call served no purpose that would not have been equally served by a call from New York; the most that can be said is that when the defendants made their despicable agreement with [the federal agent], they were told he might be calling from across the Atlantic rather than the East River—a matter of complete indifference to them."

Accordingly, the Court of Appeals held that the Paris call fit the characterization in *United States v. Corallo*, 413 F.2d 1306, at 1325 (2d Cir. 1969), *cert. denied*, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969), of "a casual and incidental occurrence" which was "insufficient to transform this sordid, federally provoked incident of local corruption into a crime against the United States" (486 F.2d at 682 and 683).

However, the facts of the instant case fit more closely the holding in *United States v. Corallo, supra*, 413 F.2d at 1325, that "the extensive references in the record to interstate telephone calls that were actually made justify the inference that the use of interstate telephone calls was not a casual and incidental occurrence but the fulfillment of an integral part of the conspiratorial consensus." Given the frequency over a period of several months of telephone calls between George Tucker in New Jersey and federal agents operating a retail record outlet in New York, the record presently before us justifies the conclusion that these interstate calls constituted or were part of a deliberate and sustained course of conduct on the part of defendants and that the Government should not be denied the opportunity to prove that they were designed to promote a criminally fraudulent scheme.

## CONCLUSION

Accordingly, for the reasons set forth above, defendants' motions to suppress evidence and to dismiss Counts Two through Ten must be, and the same hereby are, denied.