**UNITED STATES of America, Appellee,**

v.

**Richard KEATS, Appellant.**

**No. 1213, Docket 90–1643.**

United States Court of Appeals,
Second Circuit.

Submitted April 23, 1991.

Decided June 21, 1991.

Martin J. Siegel, New York City, submitted a brief for appellant Richard Keats.

Otto G. Obermaier, U.S. Atty., Peter K. Vigeland, and David E. Brodsky, Asst. U.S. Attys., New York City, submitted a brief for appellee U.S.

Before TIMBERS, NEWMAN and KEARSE, Circuit Judges.

TIMBERS, Circuit Judge:

This is an appeal from a judgment entered November 1, 1990, in the Southern District of New York, John E. Sprizzo, *District Judge*, convicting appellant on one count of conspiracy, in violation of 18 U.S.C. § 371 (1988), and six counts of wire fraud, in violation of 18 U.S.C. § 1343 (1988).

On appeal, Keats' chief contention is that the evidence was insufficient to support his conviction on the conspiracy and wire fraud counts. He also challenges the court's imposition of sentence in various respects.

For the reasons which follow, we affirm the judgment of conviction.

I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

On November 11, 1987, appellant Richard Keats, a Pennsylvania resident, called Ken Levin at his home in New York. He told Levin that he wished to discuss "an interesting situation". Unbeknownst to Keats, Levin was cooperating with the government after being convicted on an unrelated charge. Apprehensive about discussing the situation with Levin from his home phone, Keats promised to call the following day when he was "out and about". The following day Keats called Levin and informed him of a scheme to purchase $15 million in bearer bonds using a check drawn on a German bank. Keats stated that a friend worked as the manager of the broker-dealer services division of a medium size German bank and could obtain bank drafts. When Levin inquired further about the scheme, Keats became concerned that the telephone lines were tapped. After receiving Levin's assurance that the telephone lines were "clean", Keats explained that the bonds would be sold before the draft cleared. Neither Keats nor his confederate, however, had any contacts with New York brokerage houses. For this reason, Keats asked Levin, a former broker, if he had any contacts in the brokerage business. Keats suggested that Levin think about the proposal over the weekend and promised to call him again.

On December 5, Levin met Keats in an office at 401 Broadway in New York City. At that meeting, Keats told Levin that he knew an Israeli who was establishing a bank office in Luxembourg. Keats also produced a picture of the Israeli and displayed documents indicating that Keats had an account at the Luxembourg bank office. Acting on instructions from the FBI, Levin told Keats that he would intro-

duce him to a man named Al Mara. Levin explained that Mara was associated with the Mafia and would be able to procure the bonds needed to consummate Keats' scheme.

On December 7, Keats called Levin in New York and arranged a meeting for December 9 in Pennsylvania. Levin and Keats agreed that Al Mara should attend the meeting. The plans for the meeting were finalized in a call from Levin to Keats on December 8. On December 9, Keats met with Levin and an FBI agent named Dave Maniquis, who posed as Al Mara, at the Hilton Hotel in Trevose, Pennsylvania. During that meeting, Keats gave to Maniquis and Levin a detailed description of his plan, including the following. He stated that his friend had opened a bank division called Banker's Group Broker Dealers Security Division in Luxembourg. Keats' friend wanted to use a check drawn on a house bank account to purchase $15–20 million in securities, preferably bearer bonds. Keats wanted Maniquis to use his contacts to find a broker who could obtain bonds and "drag [his] heels" before presenting the bank draft. This delay would allow conversion of the bonds for cash before the bank account on which the check was drawn went "bust".

Maniquis offered a counter proposal whereby they would obtain the bonds by theft rather than using fraudulent bank checks. Maniquis explained that he had a contact in a brokerage house that had just finished an audit of the bond accounts and that it would be six months before the next audit was conducted. Keats and Maniquis then discussed how the bonds would be sold and how the proceeds would be divided. At the conclusion of the meeting, Keats gave Maniquis his telephone number and business card. That evening Keats spoke with Levin by telephone. Keats mentioned that he had just spoken to his friend and that they might be able to sell the bonds before the end of the year. Keats also inquired whether Al Mara was "happy".

On December 11, Keats called Levin and again discussed the scheme. Keats mentioned that he had spoken to his friend and that the scheme could be completed after January 1, 1988, but that his friend needed some information from Al Mara concerning the bonds. On the morning of December 14, Keats and Levin had two phone conversations. Although often speaking in codes, Keats asked Levin to obtain from Mara a list of bonds that would be stolen. On December 16 and 17, Maniquis called Keats and assured him that he had the lists that Keats wanted. They arranged to meet later in the week in New York City. During the phone conversation of December 16, Agent Maniquis told Keats that he would bring to the meeting xerox copies of bonds that would be stolen by his associate.

On December 18, Keats met Agent Maniquis at a restaurant in upper Manhattan. Keats showed Maniquis various documents, including a bank book and deposit slips, a book on banking havens, a picture of his Israeli confederate, and a copy of European banking regulations. Maniquis showed Keats a copy of two bearer bonds which Keats estimated would yield $26 million after being discounted. Maniquis also showed Keats an original bearer bond which Keats rejected because the coupons had not been clipped for several years. As Keats was leaving the restaurant at the conclusion of the meeting, he was arrested by FBI agents.

On March 17, 1988, Keats was indicted on one count of conspiracy in violation of 18 U.S.C. § 371. On May 26, 1989, a superseding indictment was filed charging Keats with six counts of wire fraud in violation of 18 U.S.C. § 1343 in addition to the one conspiracy count.

Keats waived his right to a jury trial. On March 26, 1990, his bench trial commenced. Telephone records introduced during trial showed that during the period of the conspiracy Keats made 4 calls to Luxembourg and 27 calls to the same number in Israel. One of the calls to Israel occurred at 4:03 p.m. on December 9, 1987, just after the meeting at the Trevose Hilton. After his arrest, no further calls were made to Israel or Luxembourg on calling cards used by Keats. In his defense,

Keats called Michael Stenger, a Special Agent of the United States Secret Service. Keats attempted to show that he was an informant for the Secret Service. Agent Stenger testified, however, that he never authorized Keats to act in an undercover capacity or engage in any unlawful activity. Stenger also testified that Keats never told him of the proposed bond transaction.

On April 16, 1990, the court found Keats guilty on the seven counts charged in the superseding indictment. Specifically, the court found that Keats and one other person had devised a scheme to defraud and that Keats had made, and caused to be made, interstate telephone calls in furtherance of that conspiracy. The court rejected Keats' claim that he was acting as an undercover informant.

Pursuant to Fed.R.Crim.P. 32(c), the United States Probation Department for the Southern District of New York prepared appellant's presentence report (PSI). Applying the Sentencing Guidelines in effect as of November 1, 1987, the PSI reflected that the guideline range was 83–105 months based on an offense level of 23 and a criminal history category of V. Prior to sentencing, the government moved for an upward departure of one criminal history category to category VI. According to the government, Keats had committed additional frauds after being released on bail and while he purportedly was cooperating with the FBI. Keats was awaiting sentencing in a New York state court after pleading guilty to those frauds.

On October 22 and 23, 1990, the court conducted a sentencing hearing at which Keats and the FBI case agent testified. At the hearing, the court adopted the findings in the PSI with slight modifications. While the Probation Department recommended a sentence of 83–105 months, the court found the appropriate guideline range was 77–96 months. The court agreed that an eleven-point adjustment for loss in excess of $5 million was justified because Keats wanted to sell $15 million worth of securities. The court also found that a two-point upward adjustment for more than minimal planning was appropriate due to Keats' central role

in the scheme. Since Keats attempted to flee the country on the eve of trial, the court imposed a two-point enhancement for obstruction. The court rejected a two-point enhancement for Keats' role as an organizer of the scheme. The court therefore adjusted from 23 to 21 the offense level recommended in the PSI. Finally, the court departed upward one criminal history category based on additional crimes Keats had committed while released on bail. The court ultimately sentenced Keats to 96 months imprisonment, three years supervised release and a $75,000 fine. (Although the fine initially was set at $100,000, it later was reduced at the request of appellant's counsel to reflect properly the appropriate fine for an offense level of 21).

On appeal, Keats contends that the evidence was insufficient to support his conspiracy and wire fraud convictions. He also challenges his sentence in various respects.

## II.

We turn first to Keats' contention that the evidence was insufficient to support his conspiracy and wire fraud convictions.

■ A defendant challenging the sufficiency of the evidence "bears a 'very heavy burden'". *United States v. Buck*, 804 F.2d 239, 242 (2 Cir.1986) (quoting *United States v. Davis*, 767 F.2d 1025, 1040 (2 Cir.1985)). The proof must be viewed in the light most favorable to the government and all reasonable inferences must be drawn in the government's favor. *United States v. Cervone*, 907 F.2d 332, 343 (2 Cir.1990), *cert. denied*, 111 S.Ct. 680 (1991). If "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt", the conviction must be upheld. *Jackson v. Virginia*, 443 U.S. 307, 319, (1979) (emphasis in original). Recognizing this substantial burden, we examine Keats' claims of error.

### (A)

■ Keats challenges the sufficiency of his conspiracy conviction on the ground

that the evidence failed to establish the existence of a co-conspirator.

 Viewing the evidence, and drawing all inferences in the government's favor, this contention is belied by the record. In his conversations with Levin and Maniquis, Keats repeatedly referred to having a confederate in the bond scheme. Keats told Levin and Maniquis that his confederate was an Israeli, that he worked for a German bank in Luxembourg, that he would provide a sight draft and purchase order for the bonds, and that he would help Keats sell the bonds in Europe. Contrary to appellant's contention on appeal, his own statements were admissions, admissible under Fed.R.Evid. 801(d)(2)(A) to prove the existence of a co-conspirator. *United States v. Simmons*, 923 F.2d 934, 954 (2 Cir.), *cert. denied*, 111 S.Ct. 2018 (1991); *United States v. Ianniello*, 808 F.2d 184, 195 (2 Cir.1986), *cert. denied*, 483 U.S. 1006 (1987). It is well settled that statements made in furtherance of a conspiracy carry independent indicia of reliability and do not require independent corroboration. *Simmons, supra*, 923 F.2d at 954; *Ianniello, supra*, 808 F.2d at 195; *United States v. Paoli*, 603 F.2d 1029, 1036 (2 Cir.), *cert. denied*, 444 U.S. 926 (1979).

Even assuming that Keats' statements regarding the co-conspirator required independent corroboration, the district court properly found that there was evidence corroborating the existence of a co-conspirator. Keats placed 27 calls to Israel and 4 calls to Luxembourg from November 3, 1987 to December 10, 1987. Keats placed one such call to Israel immediately after the meeting at the Trevose Hilton on the afternoon of December 9, 1987. Telephone records show that the call to Israel was made at 4:03 p.m. Later that evening at 7:40 p.m., Keats told Levin that he had spoken to his friend. Keats also showed Maniquis and Levin a photograph of his co-conspirator on two separate occasions.

We hold that the evidence was sufficient to establish the existence of a co-conspirator and to support Keats' conspiracy conviction on count one, in violation of 18 U.S.C. § 371.

(B)

 Turning next to the wire fraud counts, Keats challenges his conviction, pursuant to 18 U.S.C. § 1343, under count two on the ground that the scheme he and Levin discussed in the conversation of November 12, 1987, involved obtaining bearer bonds by fraud, whereas the scheme devised by him and agent Maniquis involved obtaining bonds by theft. Since the bonds were obtained in a manner not originally contemplated by Keats, he contends that the November 12 conversation was simply "idle chatter between individuals". The court, however, specifically found that Agent Maniquis' suggestion that the bonds be stolen was only a "slight alteration" in the scheme originally devised by Keats.

Upon our examination of the record, construing all inferences in the government's favor, we do not find the district court's conclusion erroneous. We agree that whether the bonds were obtained by fraud or theft does not significantly alter the ultimate goal of the scheme, i.e., to obtain unlawfully the proceeds from selling bonds by false and fraudulent means. Obtaining the bonds was merely an intermediate step in achieving Keats' ultimate goal. That there was a slight variation in the methodology used to achieve that goal does not negate the fact that the November 12 telephone call was placed for the purpose of furthering Keats' scheme. It is this conduct that is proscribed by the wire fraud statute, 18 U.S.C. § 1343.

We hold that the evidence was sufficient to support Keats' conviction under count two of the superseding indictment.

(C)

 Keats also challenges his conviction under counts three, four, five, six and seven. He contends that his conviction under these counts cannot be based on telephone conversations with Levin or Agent Maniquis. Rather, he contends that in order to support a conviction, the telephone calls must have been between Keats and a "true co-conspirator or victim". We disagree.

■ To establish a violation of the wire fraud statute, 18 U.S.C. § 1343, the government must prove that the defendant, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits *or causes to be transmitted* by means of wire, ... any ... sounds for the purpose of executing such scheme or artifice". 18 U.S.C. § 1343 (emphasis added). We previously have held that an act can be "caused" not only "when it was a physical consequence of the person's conduct but when, in addition, the actor either knew the consequences would occur or its occurrence was reasonably foreseeable." *United States v. Muni*, 668 F.2d 87, 89–90 (2 Cir.1981). Thus, the government need only demonstrate that Keats reasonably could have foreseen that telephone calls would have been made in furtherance of his scheme. *Id.; see also United States v. Bortnovsky*, 879 F.2d 30, 36–37 (2 Cir.1989) (construing mail fraud statute).

■ Viewing the evidence before us in the light most favorable to the government, we hold that it was appropriate to conclude that the telephone calls were a reasonably foreseeable component of Keats' fraudulent scheme. The telephone calls referred to in counts three, four, five, six and seven facilitated the acquisition of bearer bonds which was necessary to achieve the conspiratorial goal of defrauding unsuspecting investors. On December 8, 1987, Levin phoned Keats to arrange the meeting at the Trevose Hilton Hotel. At that meeting, Levin was to introduce Keats to Al Mara, a potential seller of bonds. On December 14, two further calls took place between Keats and Levin. During these calls, Keats attempted to ascertain specific information from Levin concerning bonds that Al Mara was planning to have stolen from a brokerage house. Keats also sought to arrange another meeting with Mara. On December 16, agent Maniquis, posing as Al Mara, called Keats to arrange a meeting. This call apparently was made at Keats' behest. Keats asked Maniquis to supply him, at their next meeting, with a list of bonds that were to be stolen. Finally, on December 17, in response to a request from Keats, agent Maniquis phoned Keats to finalize the details of the proposed meeting. In short, the telephone calls that underlie counts three, four, five, six and seven were an integral part of Keats' fraudulent scheme to obtain and sell negotiable bonds. There is little question that these telephone calls were a reasonably foreseeable result of Keats' scheme.

■ Keats makes much of the fact that the telephone calls underlying counts three, four, six and seven were initiated by the government. He contends that, by allowing his conviction to stand, we would be granting government agents a "license" to manufacture violations of law by merely placing telephone calls to potential defendants and discussing a scheme to defraud. On prior occasions, we have made clear that if a communication was a foreseeable result of the defendant's actions, *see Bortnovsky, supra*, 879 F.2d at 36–37, and not the result of the government's attempt to manufacture federal jurisdiction, *United States v. Archer*, 486 F.2d 670 (2 Cir.1973), such communication was sufficient to support a conviction under the wire or mail fraud statutes. We do not find that reasoning less persuasive in the context of the instant case. Subject to the above-mentioned caveats, we agree with other courts which specifically have held that mailings or telephone calls made or induced by government agents can support a mail or wire fraud conviction. *E.g, United States v. Anderson*, 809 F.2d 1281, 1287–88 (7 Cir.1987) (mailing induced by government agent); *United States v. Pecora*, 693 F.2d 421, 424 (5 Cir.1982) (telephone call induced by a government agent), *cert. denied*, 462 U.S. 1119 (1983); *United States v. Bucey*, 691 F.Supp. 1077, 1088–89 (N.D. Ill.1988) (reasonably foreseeable that government agent would use the mails), *aff'd in part and rev'd in part on other grounds*, 876 F.2d 1297 (7 Cir.), *cert. denied*, 110 S.Ct. 565 (1989); *United States v. Tucker*, 481 F.Supp. 182, 191–92 (E.D.N.Y. 1979) (telephone calls placed by government agents). By requiring that calls

forming the basis of a prosecution under § 1343 be reasonably foreseeable and not the result of the government's attempt to manufacture federal jurisdiction, we have erected barriers sufficient to prevent government abuse of the wire fraud statute. Contrary to Keats' assertion, therefore, we do not read the wire fraud statute as erecting a bar to prosecutions where the underlying telephone calls were placed or induced by government agents.

■ Furthermore, to the extent that appellant contends that the government manufactured federal jurisdiction, we disagree. In *United States v. Archer, supra,* 486 F.2d at 678–83, we were asked to address whether the evidence was sufficient to support the convictions under the Travel Act (formerly 18 U.S.C. § 1952) of several defendants, including an Assistant District Attorney of Queens County, New York. The facts underlying the indictment demonstrated that the federal government not only sent agents across state lines to place or receive telephone calls, but also caused the defendants to make calls across state lines. In considering the defendants' contentions, the court first examined the legislative history and observed that the Travel Act was aimed primarily " 'at persons who reside in one State while operating or managing illegal activities located in another.' " *Id.* at 680 (quoting *Rewis v. United States,* 401 U.S. 808, 811, (1971)). We concluded that the three telephone calls, which the government claimed brought the case within the reach of the Travel Act, were either incidental to the bribery or manufactured by the government for the sole purpose of transforming a local bribery offense into a federal crime. *Archer, supra,* 486 F.2d at 683. Holding that the government improperly sent agents across state lines to manufacture federal jurisdiction, we reversed the conviction and dismissed the indictment. *Id.*

The record in the instant case demonstrates that, not only were Keats' efforts to obtain bonds an integral component of his scheme to defraud European investors, but that he voluntarily chose to solicit aid from out-of-state residents in his attempt to procure bonds. Thus, unlike *Archer,* federal jurisdiction is not predicated upon government overreaching. Rather, Keats voluntarily chose to involve in his scheme individuals residing in other states. His own actions formed the basis for federal jurisdiction. In short, the evidence demonstrates that the concept of manufactured federal jurisdiction articulated in *Archer* is in no way implicated by this case. *See Anderson, supra,* 809 F.2d at 1287–88; *Pecora, supra,* 693 F.2d at 424; *Bucey, supra,* 691 F.Supp. at 1087; *Tucker, supra,* 481 F.Supp. at 191–92.

■ Finally, we reject Keats' contention that the wire fraud convictions should be overturned because the telephone calls in question were not between Keats and a victim or co-conspirator. Such a contention has been uniformly rejected. Courts consistently have found that there is no requirement that the wire communication be between the defendant and a co-conspirator or the victim. *E.g., United States v. Johnson,* 700 F.2d 163, 176–77, *aff'd in part and rev'd in part on other grounds,* 718 F.2d 1317 (5 Cir.1983); *United States v. Gann,* 718 F.2d 1502, 1504 (10 Cir.1983), *cert. denied,* 469 U.S. 863, (1984); *United States v. Wise,* 553 F.2d 1173, 1174 (8 Cir. 1977).

■ We hold that the evidence was sufficient to support Keats' conviction on counts three, four, five, six and seven of the superseding indictment.

### III.

Keats also challenges the court's imposition of sentence. While Keats advances a plethora of challenges to the imposition of sentence, we find that only two merit discussion.

### (A)

■ Keats first asserts that the court erred in departing upward when determining his criminal history category. In departing upward one criminal history category, the court relied on Keats' state court convictions on which he was awaiting sentencing. Since Keats' state court convic-

tions were not considered in computing his criminal history category, the court found that his criminal history was not adequately reflected. The district court stated that "[j]ust because of the fortuity of that sentence occurring after this one, which was designed to assure him a concurrent sentence under an arrangement he had with the State District Attorney's Office, he should not escape the consequences of that being included [in the determination of his criminal history category]". Keats contends that, since the state crimes for which he was awaiting sentencing were committed twenty months *after* the instant offenses, it was improper to depart upward one criminal history category.

■ The scope of our review on appeal is limited to deciding whether a sentence imposed outside the guideline range is "unreasonable". 18 U.S.C. § 3742(d)(3); *United States v. Sturgis*, 869 F.2d 54, 57 (2 Cir.1989). Consistent with our scope of review, we have held that it is appropriate to permit district judges "sensible flexibility" in sentencing under the guidelines. *Sturgis, supra,* 869 F.2d at 57; *United States v. Correa–Vargas,* 860 F.2d 35, 40 (2 Cir.1988). Only by permitting such flexibility under the guidelines "can we promote the equally important purposes of just punishment, respect for the law and adequate deterrence set forth in the Sentencing Reform Act." *Correa–Vargas, supra,* 860 F.2d at 40. With these general principles in mind, we turn to the substance of Keats' contention.

In departing upward from the guidelines, the court relied on § 4A1.3 which provides that

"[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range. Such information may include, but is not limited to, information concerning:

. . . .

(e) prior similar adult criminal conduct not resulting in a criminal conviction."

We recently have considered whether an upward departure was justified where a defendant was awaiting sentencing on unrelated charges pending in a state court. In *Sturgis, supra,* 869 F.2d at 57, the district court relied on two pending state felony convictions in departing upward two criminal history categories pursuant to § 4A1.3. The court found that, since the state crimes were not included for the purpose of calculating defendant's criminal history category, the seriousness of his criminal history was "significantly underrepresented". *Id.* On appeal, we concluded that "[h]ad the defendant been sentenced on the pending state felonies prior to the imposition of the federal sentence, his criminal history category, as indicated by the district court, would have been increased [two categories]". *Id.* Accordingly, we held that it was not unreasonable to depart from the guideline range under such circumstances. *Id.*

Although *Sturgis* involved pending state convictions based on crimes committed *prior* to the federal offenses, we find no principled distinction between that case and the one presently before us. *See United States v. Fayette,* 895 F.2d 1375, 1380 (11 Cir.1990) ("[t]he only difference between pre-plea and post-plea offenses is when they occur"; this difference is "without significance"). Both the language of guideline § 4A1.3 and our interpretation of that section make clear that the critical question under § 4A1.3 is whether the criminal history category adequately reflects the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes. If that question can be answered in the negative, it is not unreasonable to depart from the guidelines. This view is consistent with that of other courts which have held that an upward departure in the criminal history category can be based on post-arrest conduct. *E.g., United States v. Fortenbury,* 917 F.2d 477, 479 (10 Cir.1990); *United States v. Brown,* 899 F.2d 94, 97–98 (1 Cir.1990); *Fayette, supra,* 895 F.2d at 1380; *United States v. Sanchez,* 893 F.2d

679, 681–82 (5 Cir.1990); *United States v. Jordan,* 890 F.2d 968, 976–77 (7 Cir.1989).

Here, the district court found that the criminal history category did not adequately reflect the seriousness of his criminal history since it did not reflect the pending state crimes. We find that Keats' post-arrest criminal conduct—the commission of further frauds—is particularly egregious since it was the same type of conduct that led to the instant convictions. Moreover, he committed these frauds while he was released on bail for the purpose of cooperating with the FBI. Based on these circumstances, we cannot conclude that the court's finding was clearly erroneous, 18 U.S.C. § 3742(d); accordingly, the court's decision to depart upward, based on these findings, was not unreasonable. 18 U.S.C. § 3742(d)(3).

We hold that it was not unreasonable for the district court to depart upward one criminal history category based on the pending state charges.

### (B)

 This brings us to Keats' contention that the court erred in imposing a two-point adjustment for obstruction. In imposing such enhancement for obstruction, the court found that, not only did Keats attempt to flee, but he subsequently lied to the probation officer about the reasons for his flight. Keats contends that § 3C1.1, the section relied upon by the court, applies only to defendants who escape or attempt to escape from custody, avoid or flee from arrest, or recklessly endanger another during flight. He also contends, as a factual matter, that he neither lied to the probation officer nor attempted to flee on the eve of his trial.

 At the outset, we reject Keats' contention that § 3C1.1 does not apply to flight from judicial proceedings. In our view, as well as that of most other courts which have addressed the question, intentional flight from judicial proceedings is sufficient to support imposing an obstruction enhancement pursuant to § 3C1.1. *E.g., United States v. St. Julian,* 922 F.2d 563, 571 (10 Cir.1990); *United States v.*

*Teta,* 918 F.2d 1329, 1334–35 (7 Cir.1990); *United States v. Perry,* 908 F.2d 56, 59 (6 Cir.), *cert. denied,* 111 S.Ct. 565, (1990). Moreover, as we stated recently, the enhancement applies whether or not the defendant successfully obstructed justice. *United States v. Irabor,* 894 F.2d 554, 556 (2 Cir.1990). Although, as both parties agree, the guidelines in effect as of 1987 are controlling in the instant case, our view is buttressed by a recent pronouncement by the Sentencing Commission. The 1990 amendment to § 3C1.1 enumerates as an example of obstructive conduct "willfully failing to appear, as ordered, for a judicial proceeding". U.S.S.G. § 3C1.1, application note 3(e) (1990). Such pronouncements by the Sentencing Commission are entitled to "considerable deference" if they merely "clarify a meaning that was fairly to be drawn from the original version." *United States v. Guerrero,* 863 F.2d 245, 250 (2 Cir.1988).

 Having concluded that an obstruction enhancement is appropriate where a defendant attempts to flee from a judicial proceeding, we examine the record to determine whether the court properly imposed a two-point enhancement in the instant case. We assess the court's factual finding that Keats attempted to flee under a clearly erroneous standard. 18 U.S.C. § 3742(d).

 The record demonstrates that on August 30, 1989, less than a month before his scheduled trial date, a moving van filled with Keats' possessions was parked outside his home. In executing a warrant at Keats' home, the FBI found an Israeli visa application, an El Al timetable with notations regarding a flight leaving the next day, and a computer printout reserving seats for "Mr. & Mrs. Kats" on a flight to Israel the next day.

On this record, we cannot conclude that the district court's finding was clearly erroneous.

 Furthermore, even had we not found that Keats' attempted flight to avoid trial was a sufficient basis to support an

enhancement for obstruction, we agree that Keats' false statements to the Probation Department concerning his attempted flight provide an alternative basis for imposing the enhancement. *United States v. Christman*, 894 F.2d 339, 341–42 (9 Cir. 1990). Like the factual finding discussed above, we cannot conclude that the finding that Keats lied to the Probation Department was clearly erroneous.

We hold that it was not improper for the court to impose a two-point enhancement for obstruction.

### (C)

Keats raises three additional claims of error relative to the offense level applied and the fine imposed by the court. First, he contends that, in calculating the offense level for his wire fraud and conspiracy convictions, the district court should have used § 2X1.1, which covers attempts, solicitations and certain conspiracies, instead of § 2F1.1, which covers fraud and deceit. Second, he challenges the three point enhancement under § 2F1.1(b)(1), because no hearing was held to determine the value of the securities that Agent Maniquis would provide. Finally, he contends that the court erred in not holding a fact-finding hearing to determine whether he could pay the $75,000 fine.

Since appellant did not raise these contentions below, he is deemed to have waived them. *United States v. Khan*, 920 F.2d 1100, 1107 (2 Cir.1990); *United States v. Altman*, 901 F.2d 1161, 1165 (2 Cir.1990); *United States v. Soliman*, 889 F.2d 441, 445 (2 Cir.1989); *United States v. Bufalino*, 576 F.2d 446, 453 (2 Cir.), *cert. denied*, 439 U.S. 928 (1978). We decline to address these claims on appeal.

### IV.

To summarize:

The judgment of the district court and its imposition of sentence should be affirmed. Appellant has neither carried his "heavy burden" in challenging the sufficiency of the evidence nor advanced a meritorious challenge to the court's imposition of sentence.

Affirmed.